No. 2--05--0819          Filed:  8-3-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Winnebago County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No.  03--CF--1147 |
| KENNETH R. SCHNEIDER, | ) ) | Honorable Daniel D. Doyle, |
| Defendant-Appellant. | ) | Judge, Presiding. |

PRESIDING JUSTICE GROMETER delivered the opinion of the court:

Following a jury trial in the circuit court of Winnebago County, defendant, Kenneth R. Schneider, was convicted of two counts of aggravated criminal sexual assault (720 ILCS 5/12--14(a)(1) (West 2002)).  The trial court sentenced defendant to consecutive 20-year prison terms.  On direct appeal, defendant raises three arguments.  First, defendant asserts that the State's motion for automatic substitution of judge was untimely and should not have been allowed.  Second, defendant complains that the trial court committed reversible error when it prohibited defense counsel from cross-examining a police officer about whether the officer was being investigated for coercing a confession from a suspect in another case.  Third, defendant contends that comments made by the prosecutor during closing argument deprived him of a fair trial.  We affirm.

I.  BACKGROUND

In a document file stamped April 24, 2003, defendant was charged by criminal complaint with two counts of aggravated criminal sexual assault (720 ILCS 5/12--14(a)(1) (West 2002)). On May 21, 2003, the grand jury issued a two-count indictment against defendant. The indictment charged that, while displaying a knife, defendant, by the use of force, placed his penis in the vagina and anus of Sherry S. On May 27, 2003, pursuant to section 114--5(c) of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114--5(c) (West 2002)), the State filed a motion for substitution of judge, which it later amended. The trial court granted the motion. A jury trial before Judge Daniel Doyle commenced on February 22, 2005. The following evidence was adduced at the trial.

Frank Ciprys testified that at approximately 12:42 a.m. on April 17, 2003, he awoke to the sound of his dog barking. Ciprys proceeded to the front of the house, where he saw a woman sobbing on his porch. Ciprys and his wife let the woman into their home. According to Ciprys, the woman appeared to be in "a state of shock." She repeatedly stated that she had been "raped in the ass," that "he" had a knife, and that she thought that "he" was going to kill her. Ciprys called 911. A sheriff's deputy and paramedics soon arrived. Ciprys testified that the woman was dressed and that he did not notice any cuts or bruises on her.

Winnebago County Sheriff's Deputy Joseph Boomer responded to Ciprys's call. Inside the home, Boomer observed Sherry "crying hysterically." Sherry's face was red, and she was speaking quickly. Sherry told Boomer that she had been raped vaginally and anally.

Sherry testified that in April 2003, she was living on the streets of Rockford, working as a prostitute. At the time, she was pregnant and using crack cocaine. On the evening of April 16, 2003, Sherry drove to the area of 8th Street and 16th Avenue where she typically found her "dates." There,

Sherry and another prostitute went to a shop where Sherry bought some cigarettes, candy, and lemonade. As the two women were walking back to the car, Sherry's companion found a "date." Sherry continued walking to her car as a blue Bronco pulled up beside her. At trial, Sherry identified the driver of the Bronco as defendant. Sherry got into the Bronco and asked defendant his name. He responded that it was "Randy." Defendant then drove Sherry to a dark, empty parking lot.

After defendant parked the vehicle, he told Sherry that he had to urinate. Defendant got out of the vehicle and told Sherry to "take off [her] fucking pants." Sherry stated that she sat there in "shock." The next thing she remembered was defendant at the passenger-side door, with a knife in his right hand. Sherry estimated that the blade of the knife measured five or six inches. Defendant opened the door and instructed Sherry to leave the vehicle. Defendant then told Sherry to put her hands up and not to scream or say anything. According to Sherry, defendant was "really aggressive" and started taking off her clothes. Defendant also began "thumping" Sherry in the head until she told him that she was six months pregnant. Defendant then turned Sherry around, pushed her to the ground, and forced his penis into her mouth. Defendant turned Sherry around again and inserted his penis into her vagina and then into her "behind." Sherry told defendant that it hurt, and he told her not to make a sound. Defendant then reinserted his penis into Sherry's vagina before ejaculating in her. Subsequently, defendant got up, threw Sherry's clothes at her, and stated, "You fucking whores. I can't stand you fucking whores." Sherry did not move until defendant drove away.

After defendant left, Sherry fled, dressing as she ran. At the end of the road she saw three houses. No one answered at the first two. However, a couple came to the window of the third house. Sherry told the couple that she was six months pregnant, that she had just been raped, and that she needed help. The couple let Sherry in, and the police arrived soon thereafter. Later, an

ambulance took Sherry to the hospital, where a rape kit was administered. On April 22, 2003, a detective showed her a set of photographs and she selected defendant as the perpetrator of the rape. Sherry admitted that in May 2003, she pleaded guilty to burglary and received probation. At the time of her testimony, Sherry was in custody for failing to appear in court in relation to the burglary charge.

On cross-examination, Sherry testified that she had been a prostitute for three years. She denied using any narcotics or alcohol on the day in question. However, she was "pretty sure" that she had done some the day before. Sherry also admitted that she had been using crack cocaine for four years and that, prior to April 16, 2003, she smoked the substance "every day all day." She also stated that she probably used crack in the days before she spoke to the police about the case. In addition, Sherry admitted that she continued to use crack between April 23, 2003, and the date she was placed in custody on the burglary charge. Sherry denied being "under the influence" when she gave police a statement regarding the incident. However, she stated that there was a "possibility" that she used drugs the day before. Sherry stated that she had entered drug rehabilitation on four occasions. The longest time she had been sober was for the six months following the birth of her child.

Sherry could not recall how she got into defendant's vehicle or what she said before she got inside. However, she acknowledged entering the truck willingly. Sherry recalled asking defendant where they were going and him telling her that he was taking her to his house. Sherry told defendant that she did not feel comfortable "goin' way far out." However, defendant related that he wanted to leave the city limits because of the police. According to Sherry, at no time between the time she entered defendant's vehicle and the time defendant drove away was there a discussion about Sherry

being hired for sex. Sherry explained that sometimes her clients discuss sex and sometimes they do not.

Susan Oca, an emergency room nurse at Rockford Memorial Hospital, testified that at approximately 2 a.m. on April 17, 2003, she assisted in administering a rape kit for Sherry. According to Oca, Sherry was "very distraught and upset." Sherry told Oca that a man pulled her into a vehicle, took her to a quarry, and sexually assaulted her. After administering the rape kit, Oca gave it to a Deputy Phillips. Oca did not see any cuts, bruises, or lacerations on Sherry.

Rockford police officer Randy Berke testified that he and his partner were on patrol in the early hours of April 19, 2003, when they overheard a dispatch reporting that a suspect in some recent rape cases was seen driving a red truck north on 7th Street. A short time later, Berke observed a red Ford pickup truck turn directly in front of his vehicle. Berke followed the truck. At about 1:35 a.m., Berke observed the driver commit a traffic violation. Berke activated his emergency lights and pulled the truck over. Berke approached the driver's side of the truck while his partner went to the passenger side. Berke asked the driver, whom he identified in court as defendant, for his driver's license and proof of insurance. Defendant told Berke several times that he could search the truck if he wanted to, so Berke asked defendant to step out of the vehicle. Berke asked defendant what he was doing in the area and defendant responded that he was out buying cigarettes. Berke mentioned that the address on the driver's license was 19 blocks away, and defendant responded that he liked driving around that area, which Berke described as the "main area" for prostitution in Rockford. A short while later, another officer arrived. After learning that defendant had consented to a search of the vehicle, the third officer searched and photographed the truck. Among the items

photographed were two types of knives and a police scanner. Berke acknowledged that defendant was cooperative during these events and that he was ultimately released.

Having prevailed in a pretrial motion to introduce evidence of other crimes, pursuant to section 115--7.3 of the Code (725 ILCS 5/115--7.3 (West 2002)), the State presented testimony from two other prostitutes who claimed to have been sexually assaulted by defendant.

Danielle J. testified that she was working on 7th Street on the evening of November 1, 2002, when a man driving a black Ford Bronco approached. She asked the man, whom she identified as defendant, if he was a police officer. Defendant responded in the negative, and Danielle had him touch her breasts to make sure. After Danielle entered the vehicle, defendant told her that he was taking her to his house but that he would drive her back. After talking for a while, Danielle asked defendant for $20 in exchange for "sexual favors." At that point, defendant pulled out a knife and put it to her throat. Defendant then instructed Danielle to buckle her seat belt so that they would not be pulled over by the police. Defendant told Danielle that he would kill her if she made any noise.

Defendant drove Danielle down some dirt roads before stopping at a locked gate. Defendant unlocked the gate, drove the vehicle past the gate, and relocked the gate. He then drove to a building that resembled a factory. Defendant parked the vehicle, got out, urinated, and opened the passenger-side door. Defendant then told Danielle to "take [her] fuckin' clothes off" or he would kill her. Danielle complied. She then exited the vehicle, and defendant told her to perform oral sex on him. Defendant held a knife against Danielle's throat as she abided by his demand. Danielle then turned around and bent over the truck seat. At that point, defendant alternated inserting his penis in Danielle's vagina and "butt" before ejaculating in her vagina. Defendant then gave Danielle a baby wipe and told her to clean herself. According to Danielle, defendant acted as if "nothing even

happened." He then related to Danielle that he used to be a Rockford police officer, and he told her about safer areas in which to work. Danielle begged defendant to take her back to Rockford, and he agreed. According to Danielle, defendant talked like he was from the south. After exiting defendant's truck, Danielle walked around the vehicle to look at the license plate number. She then called 911 from a pay phone to report that she had been raped. A short time later, a police officer arrived. Danielle was then transported to SwedishAmerican Hospital, where a rape kit was administered.

On cross-examination, Danielle denied having a substance-abuse problem. Danielle stated that she never tried to get out of the truck or roll down the window and scream. She also stated that she did not attempt to drive away or lock the doors when defendant got out of the truck. Danielle related that on the way back to Rockford, defendant did not display his knife. However, he did tell Danielle that he would kill her if she told anybody what occurred. Danielle admitted that defendant never cut her or touched her skin with the knife.

Officer Christopher See of the Rockford police department responded to Danielle's call. See testified that Danielle was "visibly shaken." She was breathing heavily and stated that she had been raped. See escorted Danielle to SwedishAmerican Hospital and took possession of the rape kit that was administered in the emergency room.

Kathleen Williams testified that in November 2002, she was working as a staff nurse in the emergency room at SwedishAmerican Hospital. On the evening of November 1, 2002, Williams helped administer a rape kit for Danielle. During the procedure, Danielle told Williams that she was a prostitute, that a man had pulled up to her, that she asked the man to "[s]uck on [her] tit," and that she exposed herself. Danielle then got into the car, and the man held a knife to her throat and

threatened to kill her if she did not cooperate. The man then took her into the country and told her to take off her clothes. When she did not comply, he again threatened her. The man then had oral, vaginal, and anal sex with her. After administering the rape kit, Williams gave it to Officer See. Williams did not notice any cuts, bruises, or lacerations on Danielle.

Stacey C. testified that she worked as a prostitute to support her drug habit. In May 2000, Stacey pleaded guilty to cocaine possession, and in September 2004, she was placed on probation after pleading guilty to possession of cocaine with intent to deliver. Stacey stated that she last used drugs in July 2004.

Stacey testified that sometime late in March 2003 or early in April 2003, she was at 6th Street and 15th Avenue. In the early morning hours, defendant pulled over in his truck and Stacey asked him if he was looking for a "date." Defendant responded in the affirmative. Stacey then asked defendant to touch her breasts, and defendant complied. Defendant told Stacey that his name was Ken, and he drove her to a place near Meridian Road. After parking the truck, defendant told Stacey that he had to urinate. According to Stacey, defendant then exited the truck, came around to the passenger side of the vehicle, reached in, hit Stacey in the mouth, grabbed her, and scarred her face. As he held a knife, defendant threw Stacey out of the truck and told her that if she did not take off her clothes, he would cut her. Stacey took off her pants, and defendant proceeded to penetrate her vaginally and anally. After ejaculating in Stacey's anus, defendant stood up, threw $20 at her, and told her to get dressed. Stacey asked defendant for a ride back, and he agreed, adding that he was sorry and that he had never done that before. Defendant also told Stacey that the knife was not real.

During the ride back, defendant again apologized for his behavior and he offered to buy her a steak dinner if he ever saw her again. When he dropped Stacey off at 7th Street and 15th Avenue,

he pointed at a house and asked her if she was going there. Stacey asked him why, and defendant related that he was "affiliated with the police" and that the police were going to raid the building. Stacey did not report the incident to the police until a couple of days later because she was a homeless drug addict and did not think that the police would care or believe her. In May 2003, Stacey identified defendant from a police lineup as the man who attacked her. On cross-examination, Stacey testified that she used drugs on the day of her encounter with defendant but that she was sober at the time of the incident.

Dennis Aubuchon, a forensic biologist with the Illinois State Police, tested vaginal swabs taken from Sherry and Danielle. Aubuchon found semen on both swabs. Laurie Lee, a forensic scientist with the Illinois State Police, performed DNA testing on samples from Sherry, Danielle, and defendant. Lee testified that the semen found on the swab taken from Sherry contained a mixture of DNA profiles from at least three donors. Lee concluded that "[defendant], Sherry [S.], and at least one other individual cannot be excluded from having contributed to this mix profile." Based on a comparison of three loci, 1 out of 37 black, 1 out of 2 white, or 1 out of 2 Hispanic unrelated individuals could not be excluded. Lee noted that she ordinarily bases comparisons on 13 loci, but that she could not do that with the sample taken from Sherry because of the number of contributors. Lee also found a mixed profile on Danielle's swab. One DNA profile matched the DNA profile of defendant and would occur in approximately 1 in 10 quintillion blacks, 1 in 1.7 quintillion whites, or 1 in 540 quadrillion Hispanics. Based on this information, Lee testified that the semen recovered from the vaginal swab taken from Danielle originated from defendant.

Rockford police detective Paul Swanberg testified that he and Detective Glen Heidenreich interrogated defendant at around 8:15 p.m. on April 23, 2003. According to Swanberg, defendant

was first given <u>Miranda</u> warnings, and he indicated that he understood them. He then initialed a rights form and signed it. The detectives then spoke with defendant for about 1 hour and 20 minutes before taking a bathroom break. Swanberg noted that during the interrogation, defendant spoke with a southern drawl. Defendant was also given water at his request, and the interrogation resumed at 9:47 p.m. At about 10:51 p.m., defendant agreed to provide a written statement. Swanberg typed the statement on a laptop computer. He then printed the statement and reviewed it with defendant. Swanberg had defendant read the first sentence or two out loud to determine if defendant could read and understand English. Swanberg then read the rest of the statement to defendant. Once Swanberg finished, defendant was given a pen to make any changes to the statement. Defendant changed some grammar and spelling on the first page. Defendant then initialed the changes and signed his name and wrote his address on the second page. Immediately after the first statement was taken, the detectives obtained a second written statement from defendant using the same procedure. Defendant was returned to his jail cell at about 1:20 a.m. At about 9:30 a.m. on April 24, 2003, Swanberg spoke with defendant again. At that time, defendant was again advised of his rights. Swanberg spoke with defendant until about 1 p.m.

On cross-examination, Swanberg testified that the interrogation room measured 6 feet by 10 feet or 6 feet by 12 feet. Swanberg stated that defendant never asked to speak with an attorney. Swanberg also stated that defendant was not wearing glasses during the interview and that, as far as Swanberg knew, defendant did not need glasses. Swanberg added that defendant never told him that he was sick or in pain, defendant never put his head in his hands, and defendant never laid his head down on the table.

The State then read defendant's two statements to the jury. In the first statement, defendant admitted picking up a woman on 16th Avenue. The woman asked defendant if he was a cop and then took defendant's hand and put it on her breasts. She also placed her hand on defendant's crotch. Defendant then drove the woman to the west side, in his Bronco. The two began to discuss how much defendant would pay to have sex with the woman. They eventually agreed on the amount of $25. Defendant pulled into a parking lot off of Harrison Road and exited the car. He urinated and then walked to the passenger side of the vehicle, opened the door, and gave the woman the money. The woman refused to do anything unless defendant gave her more money. At that point, defendant pulled out a knife with a folding five-inch blade and told her to take off her clothes. The woman complied and defendant put away the knife. Defendant proceeded to penetrate the woman vaginally and anally. Defendant was not sure if he ejaculated. As defendant pulled up his pants, the woman kicked him in the thigh. He then told the woman he was leaving her there, and he drove home.

In the second statement, defendant explained that as a result of certain life events, he wanted to die "the easiest way out," so he decided to contract AIDS and "fade out." Accordingly, defendant had been having unprotected sex with prostitutes for about 18 months. At first, defendant paid the prostitutes. However, five or six months prior to giving the statement, he began to force the prostitutes to have sex with him, because he did not have any money. Defendant would drive the women to a location near where he used to work. When they arrived, he would show a knife. Defendant never used a condom, because he was hoping to catch something from the women. Defendant related that, with one or two exceptions, he drove the women back to town. One of the women he picked up had her own knife and cut defendant's left arm and stomach. Defendant told some of the women that his name was "Randy."

Defendant testified on his own behalf. Defendant stated that in early 2003 he was living on 8th Street in Rockford with his girlfriend, her son, and her brother. Defendant was unemployed at the time and his emotional condition was "not too good." Defendant had recently learned that his divorce had been finalized and that his ex-wife's daughter was not his biological child. Moreover, defendant's mother recently passed away, and he lost his job after padding his time card. Defendant thought about committing suicide, but did not have "the guts" to shoot himself. He did not want anyone else to get hurt, so he devised a plan to contract AIDS and "fade out." Defendant did not tell anyone else of his plan.

In October or November of 2002, defendant started picking up prostitutes along 7th Street, mostly at night. At the time, defendant had two vehicles, a red 1993 Ford F-150 pickup truck and a black 1999 Ford Bronco. Defendant testified that normally he would drive the pickup truck to look for prostitutes. Defendant explained that he would pull up to a particular woman and she would ask if he wanted a "date." If he responded yes, the woman would enter the vehicle, and defendant would drive away. The pickup truck had electric door locks, but a person in the truck could manually unlock the door. The truck's windows were not tinted. Once in the vehicle, the woman and defendant would discuss the price and the particular sex act desired. Defendant usually took the woman to a place about five miles from where he picked her up. Defendant would usually give the woman her money before he exited the vehicle. After exiting, he would "relieve himself," go to the passenger side of the truck, tap on the window, open the door, and ask the woman to take down her pants. Defendant would leave the keys in the ignition. Defendant testified that when he first started going to prostitutes he did use a condom because he was not sure he wanted to contract a disease. However, he later stopped using protection. After having sex, defendant would offer the woman a

towelette to clean herself off and he would drive the woman back to town. Defendant admitted owning several knives. He testified, however, that he normally did not keep knives in his vehicles. If he had a knife in the pickup truck, he kept it in a nylon case under a box of tissues in the console. Defendant also had a scanner, which he used to listen to fire and police calls.

Defendant admitted picking up Sherry in the vicinity of 8th Street and 16th Avenue, but was sure it happened on April 16, 2002, not 2003. At the time, defendant was driving his Ford Bronco. Defendant approached Sherry and she got into the vehicle. Sherry asked defendant if he was looking for a "date" and whether he was a police officer. Defendant responded that he was not a police officer, and Sherry touched defendant's genital area. Defendant then asked Sherry if she was a police officer. Sherry responded in the negative, and defendant reached over and touched her breasts or her genitals. According to defendant, Sherry appeared to be "strung out," "agitated," and "hyped up." Sherry was wearing a coat and defendant was not aware that she was pregnant. Sherry agreed to oral, vaginal, and anal sex in exchange for $25. After arriving at his usual spot, defendant paid Sherry, and they engaged in consensual sex. After they completed the transaction, Sherry asked for more money. Defendant told Sherry that he did not have any more money. Sherry became upset and started calling defendant names. Sherry then kicked defendant in the left thigh. Defendant told Sherry that if she was going to act like that, he would leave her there. He then drove away without her. Defendant denied hitting Sherry, threatening to kill her, or holding her at knifepoint.

Defendant initially denied knowing Danielle. Later, however, defendant admitted having sex with her in exchange for $20 or $25. Defendant denied holding a knife to Danielle or threatening to kill her. Defendant also acknowledged picking up Stacey. In exchange for $20 or $25, the two had consensual sex. Defendant denied punching Stacey or threatening her life.

Defendant explained that on the evening he spoke with Swanberg and Heidenreich, he had a migraine headache. Defendant stated that at the time of the interrogation, he had been suffering from migraines for about 2½ years and was on medication for them. Defendant twice told the detectives that he had a migraine and would like his medication, but they ignored him. Defendant also testified that he wears glasses to read but he did not have them with him during the interrogation. When the detectives handed defendant the rights form, he told them he could not make out the words because he did not have his glasses. Neither detective offered him a pair of glasses. Although he could not read the rights form, he signed it after Heidenreich pointed to the area where defendant needed to sign. Defendant stated that he was unable to see the screen of the laptop computer used to take down his statement. Once the statement was reduced to writing, it was presented to defendant. Defendant stated, however, that he was unable to read it and the detectives did not read it to him. Nevertheless, defendant signed the statement and placed his initials at corrections because he was "under the impression" that the statement was what he had told the detectives and that certain corrections needed to be and were made.

Defendant admitted that Heidenreich read the rights form to him. He also admitted that he never asked to see a doctor or a nurse because of his condition. Defendant testified that he told the detectives three times that he wanted a lawyer. Swanberg responded that it was just a discussion between three people and that there was no reason to have a lawyer present. Defendant estimated that he told the detectives between 12 and 15 times that no knife was involved in his encounters with prostitutes. Defendant stated that on the night he was stopped by the police, they found a small plastic folding knife buried in the console of his pickup truck. He related that he carried the knife just in case he hit a deer while driving.

On cross-examination, defendant admitted that Heidenreich told him at the beginning of the interrogation that defendant had to understand his rights. Defendant admitted that he told the detectives that he understood his rights and that he agreed to talk with them. Defendant stated that it was "a possibility" that he told jail personnel only that he had "dry skin disease" when they asked whether he had any medical problems. On redirect, defendant attributed his migraine headaches to three lesions on the frontal lobe of his brain, discovered in February 2002. On recross, defendant admitted that he did not tell the booking officer that he had lesions on his brain. However, he testified that he told the booking officer that he had been prescribed medication for migraine headaches and for ulcers. Defendant also testified that he told Swanberg and Heidenreich that he had brain lesions.

In rebuttal, the State first called Ruth Raxter, a booking officer for the Winnebago County sheriff's department. Raxter testified that on April 24, 2003, at about 1:21 a.m., she processed defendant. According to Raxter, defendant did not appear to be ill at that time. Raxter asked defendant to list all medications that he took. Defendant responded that he did not take any medications. Moreover, the only ailment that defendant mentioned having was a dry skin disorder. Defendant denied being under a doctor's care. On cross-examination, Raxter testified that she could not recall whether defendant wore glasses when he was given a document to read.

Swanberg was recalled to testify that defendant never mentioned having brain lesions, suffering from migraines or any other medical ailments, or having to take any medication. Swanberg also stated that defendant never asked for an attorney during the interrogation.

Heidenreich also testified. Heidenreich's testimony regarding the procedure used to obtain defendant's statements was substantially similar to the testimony provided by Swanberg during the

State's case in chief and in rebuttal. Notably, Heidenreich testified that defendant never asked for an attorney, he never stated that he was taking any medication, he never related that he had lesions on his brain, he never complained of any illness or headache, and he never exhibited signs of any ailment. Heidenreich added that defendant was never denied any medication and that defendant never stated that a knife was not used in the incidents with the prostitutes. On cross-examination, Heidenreich admitted telling defendant that the police were checking with other states and that if his name and DNA came up, they would "get" him. Heidenreich denied telling defendant that the police were going to link him to a murder. During Heidenreich's cross-examination, defense counsel sought to ask him whether he was under investigation for "coaching" a false confession from a 14-year-old suspect in another case. Following a sidebar, the trial court sustained the State's objection to this line of questioning.

After closing arguments, the jury began deliberations. Ultimately, the jury returned verdicts of guilty on both counts of aggravated criminal sexual assault. On May 20, 2005, after hearing evidence and argument in aggravation and mitigation, the trial court sentenced defendant to two consecutive 20-year terms of imprisonment. On June 3, 2005, defendant filed a motion for a new trial and a motion to reconsider his sentence. At a subsequent hearing, defendant withdrew the motion for a new trial and the trial court denied the motion to reconsider his sentence. Defendant timely appealed.

## II. ANALYSIS

### A. Substitution of Judge

On appeal, defendant first asserts that the trial court erred in granting the State's motion for substitution of judge, because it was not filed within the 10-day time period specified in section 114-

-5(c) of the Code (725 ILCS 5/114--5(c) (West 2002)). The State responds that defendant has waived consideration of this issue by failing to file a written response to the State's motion or raise it in a posttrial motion. Alternatively, the State argues that its motion was timely because it was filed <u>prior</u> to the cause being placed on the court's trial call. Thus, the State reasons, its motion was premature, not untimely.

We agree that defendant has waived consideration of this issue. As detailed more thoroughly below, when the motion was presented to Judge Steven Vecchio, defense counsel did not object on the basis that the motion was untimely. See <u>People v. Friend</u>, 177 Ill. App. 3d 1002, 1020-21 (1988) (noting that a specific objection results in the waiver of all grounds not specified in the objection). In addition, defendant did not challenge the timeliness of the State's filing in a posttrial motion. See <u>People v. Enoch</u>, 122 Ill. 2d 176, 186 (1988) (holding that in order to properly preserve an issue for appellate review, a defendant must both make a timely objection and raise the issue in his posttrial motion); <u>People v. Williams</u>, 272 Ill. App. 3d 868, 874 (1995) (concluding that defendant waived challenge to trial court order denying his motion for substitution of judge where defendant did not raise issue in his posttrial motion).

Notwithstanding defense counsel's failure to object to the timeliness of the State's motion for substitution of judge and her failure to raise the issue in a posttrial motion, defendant asserts that the trial court order granting the State's motion amounted to either plain error reviewable by this court under Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) or ineffective assistance of counsel. We address defendant's plain-error claim first. Under the plain-error doctrine, a reviewing court may address a forfeited claim where (1) the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from the error and not the evidence or (2) the error is so serious that the

defendant was denied a substantial right, and thus a fair trial. People v. Herron, 215 Ill. 2d 167, 178-79 (2005). Under either circumstance, the burden of persuasion falls upon the defendant. See People v. Nitz, 219 Ill. 2d 400, 410 (2006). Obviously, if the State's motion for substitution of judge was timely, no error occurred. Therefore, our initial task is to determine if the State filed its motion within the applicable time frame.

Section 114--5(c) of the Code provides:

"Within 10 days after a cause has been placed on the trial call of a judge the State may move the court in writing for a substitution of that judge on the ground that such judge is prejudiced against the State. Upon the filing of such a motion the court shall proceed no further in the cause but shall transfer it to another judge not named in the motion. The State may name only one judge as prejudiced, pursuant to this subsection." 725 ILCS 5/114--5(c) (West 2002).

Under this statute, substitution is automatic if the motion is filed within 10 days after the cause has been placed on the trial call of a judge, the motion names only one judge, the motion is made in writing, the motion alleges that the trial judge is prejudiced against the State, and the motion is made before any substantive rulings in the case. See People v. McDuffee, 187 Ill. 2d 481, 487-88 (1999). In this case, the State's substitution motion was in writing, the amended motion named only one judge, it alleged that the trial judge was prejudiced against the State, and no substantive rulings had been made in the case when the motion was filed. Therefore, the decision to grant the motion was improper only if the State failed to file the motion within 10 days after the case had been placed on Judge Vecchio's trial call.

Our research has not located any cases discussing how to calculate the 10-day time period set forth in section 114--5(c). However, section 114--5(a) of the Code (725 ILCS 5/114--5(a) (West 2002)), which allows a defendant an automatic substitution of judge, is similar to the State's right under section 114--5(c). See People ex rel. Baricevic v. Wharton, 136 Ill. 2d 423, 430 (1990) (pointing out that the language in section 114--5(c) of the Code is "virtually identical" to the language in section 114--5(a) of the Code). As such, we find cases interpreting section 114--5(a) helpful to our analysis. Like section 114--5(c), section 114--5(a) requires a party seeking the substitution of a judge to file a motion "[w]ithin 10 days after a cause *** has been placed on the trial call of a judge." 725 ILCS 5/114--5(a) (West 2002). In McDuffee, the supreme court addressed when the 10-day time period specified in section 114--5(a) begins to run. In the course of its analysis, the McDuffee court discussed the practice of judicial assignments, noting that in Illinois the practice for assigning judges varies from circuit to circuit. McDuffee, 187 Ill. 2d at 489. Because our state lacks a statute or court rule requiring that the assignment of judges be made in a formal, written fashion, Illinois courts developed a test to calculate the 10-day period set forth in section 114--5(a). McDuffee, 187 Ill. 2d at 490. Under this test, a motion for substitution of judge is timely if it is brought within 10 days after the date the party filing the motion could be "charged with knowledge" that the judge at issue had been assigned to the case. McDuffee, 187 Ill. 2d at 490. This analysis is case specific and depends upon the record presented. People v. Evans, 209 Ill. 2d 194, 216 (2004).

In this case, we need not rely on the "charged with knowledge" test to determine when defendant's case had been placed on the trial call of a judge, because Winnebago County's criminal

division has a formal procedure for assigning judges. We begin by examining the local court rules of the 17th Judicial Circuit, of which Winnebago County is part. A local court rule provides that the assignment of cases shall be "by the chief judge as directed by general order or otherwise." 17th Judicial Cir. Ct. R. 4 (eff. January 1, 1996). General Order 2.01 (17th Judicial Cir. Gen. Order 2.01 (eff. February 2, 2003)) governs the assignment of cases in Winnebago County's criminal division. When the State filed its substitution motion, General Order 2.01(B)(1) provided that "[f]elony cases will be assigned to a judge upon the filing of the indictment or information." 17th Judicial Cir. Gen. Order 2.01(B)(1) (eff. February 2, 2003).[1] Moreover, General Order 2.02(B) provided that "[a]ll felony *** cases, when an indictment or information is filed in the Criminal Division of this court, shall automatically and in appropriate rotation be assigned for trial and all other purposes" to a judge assigned to the criminal division. (Emphasis added.) 17th Judicial Cir. Gen. Order 2.02(B) (eff. February 11, 2002). Thus, when the State filed its substitution motion, a case was considered to be placed on the trial call of a judge in Winnebago County's criminal division automatically following the filing of the indictment or information. We note, parenthetically, that neither party cites to or discusses these authorities.

---

[1] General Order 2.01(B)(1) has since been amended and now provides that "[f]elony cases will be considered to be placed on the trial call of the trial judge at the defendant's first court appearance with counsel following presentment." 17th Judicial Cir. Gen. Order 2.01(B)(1) (eff. December 4, 2006). We offer no opinion regarding the outcome of this case had the amended rule been in effect when the State filed its substitution motion.

Applying the aforementioned authorities to the case at issue, we conclude that the State's motion for substitution of judge was timely. The record shows that defendant was charged by criminal complaint filed on April 24, 2003, with two counts of aggravated criminal sexual assault (720 ILCS 5/12--14(a)(1) (West 2002)). One day later, the parties appeared before Judge R. Craig Sahlstrom. At that time, Judge Sahlstrom inquired whether defendant understood his rights and the charges against him, appointed a public defender to represent defendant, and continued the matter to May 9, 2003.

On May 9, the parties first appeared before Judge Vecchio. At that time, the assistant State's Attorney stated:

"Your Honor, we're here for arraignment on Bill of Indictment. It has not gone to the Grand Jury yet. I don't entirely know whose case it is. Since the Court's soonest status date is the 23rd, I'll ask for that."

Meanwhile, on May 21, 2003, a two-count indictment was filed against defendant. When the parties appeared before Judge Vecchio on May 23, 2003, defendant entered a plea of not guilty to both counts. The court then queried, "I guess this is assigned to me or who?" Both parties responded in the affirmative. Defense counsel then asked to file a motion for discovery and an answer to the State's motion for disclosure. The matter was continued to May 30 for status.

On May 27, 2003, the State filed a motion for substitution of judge "pursuant to 725 ILCS 5/114--5(e) [sic]." The motion alleged that the cause had been placed on Judge Vecchio's call "on or about May 21, 2001 [sic]," and that the motion was "based on the fear that Judge Vidal [sic] is so prejudiced against the People that [the State] cannot receive a fair hearing." The motion sought

"a substitution of <u>judges</u> in this cause." (Emphasis added.) The State presented its motion to the court on May 30. At that time, defense counsel noted that the State's motion was "confusing" and "insufficient." Defense counsel then told Judge Vecchio that she was not disputing that the cause was placed on his docket on May 21. However, she questioned at which judge the motion was directed and contended that the motion cited to a nonexistent subparagraph. The State offered to file an amended motion to include the proper statutory provision and to clarify that it was its intent to seek the substitution of Judge Vecchio. Judge Vecchio granted the State leave to file the amended motion and removed himself from the proceedings. An amended motion was filed on May 30. The amended motion cited section 114--5(c) of the Code (725 ILCS 5/114--5(c) (West 2002)) and sought the substitution of Judge Vecchio.

Because the indictment against defendant was not filed until May 21, 2003, that is the earliest that the case could have been assigned to a judge for trial under the local court rules in effect when these events took place. 17th Judicial Cir. Ct. R. 4 (eff. January 1, 1996); 17th Judicial Cir. Gen. Order 2.01(B)(1) (eff. February 2, 2003); 17th Judicial Cir. Gen. Order 2.02(B) (eff. February 11, 2002). The latest that the case could be considered assigned to a judge for trial is May 23, 2003, when the parties appeared before the court and agreed that Judge Vecchio had been assigned to the case. Under either scenario, the State's substitution motion was timely. The State's original substitution motion was filed on May 27, 2003, and its amended motion was filed on May 30, 2003. Both of these motions were therefore filed within 10 days after the cause could have been considered to be placed on the trial call of Judge Vecchio. Because we have concluded that the State's substitution motion was timely under section 114--5(c) of the Code, it necessarily follows that the

trial court's decision to grant the motion did not rise to the level of plain error, as there was no error at all in granting the motion. See People v. Wood, 341 Ill. App. 3d 599, 612 (2003) ("There can be no plain error absent reversible error"). For the same reason, we reject defendant's claim that defense counsel was ineffective for failing to challenge the timeliness of the State's substitution motion. See People v. Starnes, No. 2--05--0714, slip op. at 5-6 (June 12, 2007) (pointing out that to succeed on a claim of ineffective assistance of counsel, a defendant must demonstrate both that counsel's performance was objectively unreasonable and that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different).

### B. Cross-examination of Detective Heidenreich

Next, defendant asserts that the trial court erred when it failed to allow defense counsel to cross-examine Heidenreich about whether he was under investigation for coercing a false confession from a 14-year-old suspect in another case. According to defendant, the decision to bar him from pursuing this line of questioning stymied his defense, as such evidence could have cast doubt upon police testimony regarding defendant's use of a knife during the assault on Sherry, as well as defendant's failure to mention having a migraine headache at the time of the interrogation or needing his glasses to read his statement before signing it. The State responds that defendant has waived this issue and that, in any event, evidence regarding an alleged investigation of Heidenreich in another case is irrelevant to the voluntariness of defendant's confession in this case.

Initially, we note that defense counsel did not raise this issue in a posttrial motion. As such, it has been waived. Enoch, 122 Ill. 2d at 186. We also agree with the State that evidence that Heidenreich was being investigated regarding an allegation that he had coerced a false confession

from a minor in another case is irrelevant to whether the confession defendant made in this case was voluntary.

"While a defendant has the right to present a defense, a trial court has broad discretion in ruling on evidence sought to be excluded as irrelevant." People v. Bohn, 362 Ill. App. 3d 485, 490 (2005). Whether evidence is relevant and admissible is a matter within the sound discretion of the trial court. People v. Turner, 373 Ill. App. 3d 121, 124 (2007). As such, the trial court's determination regarding the admissibility of evidence will not be reversed on appeal absent an abuse of discretion. Green v. Lake Forest Hospital, 335 Ill. App. 3d 134, 139 (2002). "Relevant evidence is evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable than it would be without the evidence." People v. Buck, 361 Ill. App. 3d 923, 938 (2005). Nevertheless, where the proffered evidence is remote, uncertain, or speculative, the trial court in its discretion may properly reject it. People v. Ursery, 364 Ill. App. 3d 680, 686 (2006).

In People v. Hobley, 159 Ill. 2d 272 (1994), our supreme court addressed the admissibility of allegations of prior police brutality. In Hobley, the defendant alleged that he was physically abused and racially harassed by a Detective Dwyer while being interrogated. The defendant sought to introduce the testimony of others who had filed complaints against Dwyer. The State filed a motion in limine to exclude testimony regarding prior alleged abuse by Dwyer. At the hearing on the State's motion, the defendant presented testimony from three individuals who were allegedly abused by Dwyer. Following the hearing, the trial court granted the State's motion, and the defendant raised the issue on appeal before our supreme court.

The supreme court held that the trial court properly excluded the testimony of the three witnesses who alleged prior abuse by Dwyer, because it was not relevant. Hobley, 159 Ill. 2d at 312. The court did not conclude that such evidence would always be inadmissible. However, it identified four factors to consider in assessing the admissibility of evidence regarding prior allegations of police brutality: (1) whether the prior allegations of police brutality were unduly remote in time from the defendant's allegations; (2) whether the prior allegations of police brutality were against the same officer; (3) whether the prior allegations of police brutality were similar to the allegations put forth by the defendant; and (4) whether, in both the prior allegations of abuse and the case before the court, there was evidence of injury consistent with police brutality. Hobley, 159 Ill. 2d at 312. In Hobley, the evidence demonstrated that the allegations of two of the witnesses were dissimilar to the defendant's allegations and that the allegations of the third witness were both remote in time (three years prior to the defendant's allegations) and devoid of evidence that the witness sustained injuries consistent with his claim of police brutality. Hobley, 159 Ill. 2d at 312.

In this case, defendant does not allege that he was physically abused by the police. Rather, he raises a claim of coercion. Nevertheless, we find the analysis in Hobley instructive. Adapting the elements identified in Hobley to the facts of this case, we must assess whether the prior allegation of coercion was remote in time from defendant's allegation, whether the prior allegation of coercion was made against the same officer, and whether the prior allegation of coercion was similar to defendant's allegation.

In this case, defendant presented evidence of a prior allegation of coercion made against Heidenreich. Defendant also suggested that the prior allegation was made recently. However, the

record is devoid of any claim that the techniques allegedly used to coerce defendant's confession were similar to the techniques alleged in the prior claim against Heidenreich. The record demonstrates that at trial, defense counsel began to ask Heidenreich whether he was "under investigation." The State immediately objected to the question, and the trial court sustained the objection. Outside the presence of the jurors, defense counsel told the trial court that Heidenreich was "currently under investigation regarding a very suspicious false confession elicited from a 14 year old minor in a murder case." According to defense counsel, the confession was suspicious "as to the techniques involved." Defense counsel stated that there was a "parallel" with what defendant went through. The judge responded that from what he heard, he was unable to determine whether there was anything more than a "suspicion of something" and noted that "there's no proof of anything before the Court that this officer has been disciplined or has done anything." Defense counsel replied that all she wanted to "get out" was that Heidenreich was "currently under investigation." Defense counsel then had her superior address the court. He stated that the fact that Heidenreich was under investigation goes to the detective's credibility. Ultimately, the trial court upheld its decision to sustain the State's objection, reiterating that the fact that there is an investigation in progress "proves nothing." The court noted that the investigation may clear Heidenreich of any misconduct, and it stated that it did not want to "try a side issue."

As the record above demonstrates, the only similarity between defendant's case and the prior case is the allegation of coercion itself. Accordingly, we are not persuaded that the trial court abused its discretion in disallowing defense counsel to cross-examine Heidenreich regarding whether he was under investigation for coercing a confession from a suspect in another case. The cases defendant

cites in support of his position are easily distinguishable. For instance, in People v. Charleston, 132 Ill. App. 3d 769, 776 (1985), it was held that the trial court properly permitted the State to cross-examine the defendant's expert witness regarding a testing error made by the witness in a prior, unrelated case. In People v. Banks, 192 Ill. App. 3d 986, 993-94 (1989), the court found evidence of prior police brutality relevant to the defendant's case because the prior acts allegedly occurred only 13 months before the defendant's case, the same police officers were involved in the prior case and in the defendant's case, and, most important (and unlike the present case), similar techniques of brutality were alleged in both cases.

Having found that the trial court's decision to disallow defense counsel to cross-examine Heidenreich regarding whether he was under investigation for coercing a confession from a suspect in another case was not error, we need not address defendant's alternative claim that defense counsel was ineffective for failing to raise the issue in a posttrial motion. See Starnes, slip op. at 5-6.

### C.  State's Closing Argument

Finally, defendant argues that he was deprived of a fair trial because of comments made by the prosecutor during closing argument. In particular, defendant complains about the following remarks made by Assistant State's Attorney Glen Weber as he concluded his rebuttal closing argument:

"Put all of this evidence together as a whole. The human condition. Now I am going to ask you to send this Defendant a message: Prostitutes can be raped. Sherry [S.] was raped in this case because all the evidence has proven it. I am going to ask you now to reach deep down and be human and have some compassion for someone who does have some dignity

to protect. This Defendant tried to strip her of her last vestige of human dignity. You can help restore that dignity with your verdict."

Defendant contends that the State's closing argument was improper because it constituted a direct appeal to the jurors' sympathies. Defendant notes that these comments were the last words the jury heard from either party before retiring to deliberate, and he reasons that because he presented a tenable claim to the jury that his contact with Sherry was consensual, an emotional appeal for compassion or sympathy could well have convinced the jury to return a verdict of guilty.

The State responds initially that defendant has failed to preserve this issue for review as defense counsel did not object to the complained-of remarks at trial and she did not raise the issue in a posttrial motion. Alternatively, the State asserts that the prosecutor's isolated remarks were not prejudicial and that, in any case, they were provoked by defense counsel's attempts to disparage the victim during her closing argument.

We agree with the State that defendant waived this issue by failing to object to the remarks at trial and raise the issue in a posttrial motion. Enoch, 122 Ill. 2d at 186; People v. Swart, 369 Ill. App. 3d 614, 636 (2006); Wood, 341 Ill. App. 3d at 612. Defendant concedes that he procedurally defaulted this issue. However, he once again urges us to consider this issue under the plain-error doctrine. We note that the standard for reversal due to improper closing argument by the State is much the same as the plain-error standard. People v. Libberton, 346 Ill. App. 3d 912, 922 (2004). Thus, as we have stated on a prior occasion, the failure to raise such an issue before the trial court has little effect. Libberton, 346 Ill. App. 3d at 922. Therefore, we will address the issue.

In determining whether the prosecutor's closing remarks constituted error, we are guided by the following principles. Generally, prosecutors are afforded a great deal of latitude in closing argument. People v. Slabaugh, 323 Ill. App. 3d 723, 729 (2001). As such, the State may comment on the evidence and all reasonable inferences drawn therefrom. People v. Blue, 189 Ill. 2d 99, 127 (2000). However, argument that serves no purpose but to inflame the jury is improper. Blue, 189 Ill. 2d at 128; Slabuagh, 323 Ill. App. 3d at 729. Moreover, it is improper for the prosecution to direct the jury's attention away from the elements of the crime by commenting on issues irrelevant to the question of guilt or innocence. People v. Moore, 356 Ill. App. 3d 117, 120 (2005). In a determination of whether a prosecutor's remarks were improper, a closing argument must be viewed in its entirety and the allegedly erroneous remarks must be viewed contextually. Blue, 189 Ill. 2d at 128. As a general rule, an improper closing argument by the State will constitute reversible error only if there is doubt as to whether the jury would have rendered a guilty verdict absent any improper comments. Libberton, 346 Ill. App. 3d at 924.

In this case, the prosecutor's exhortations that the jury have some compassion for the victim and help her restore her dignity were based neither on the evidence presented at trial nor on a reasonable inference from such evidence. Moreover, these issues were irrelevant to whether defendant was guilty or innocent. As such, we find that the prosecutor's remarks were improper as they served only to inflame the passions of the jury. See People v. Spreitzer, 123 Ill. 2d 1, 38 (1988) (noting that the State was not free "to invite the jurors to enter into some sort of empathetic identification with the victims"); People v. Liner, 356 Ill. App. 3d 284, 297-98 (2005) (concluding that it was improper for the prosecutor to present closing argument that evoked sympathy for the

victim based on her age and urged the jury to convict the defendant to protect other children in the county); Wood, 341 Ill. App. 3d at 614 (holding that it was improper for the State to remark during closing argument that the jury place itself in the shoes of the victim).

The question remains, however, whether this error rose to the level of reversible error. We find that it did not. Defendant was convicted of two counts of aggravated criminal sexual assault pursuant to section 12--14(a)(1) of the Criminal Code of 1961 (720 ILCS 5/12--14(a)(1) (West 2002)). That provision states:

"(a) The accused commits aggravated criminal sexual assault if he or she commits criminal sexual assault and any of the following aggravating circumstances existed during *** the commission of the offense:

(1) the accused displayed, threatened to use, or used a dangerous weapon, other than a firearm, or any object fashioned or utilized in such a manner as to lead the victim under the circumstances reasonably to believe it to be a dangerous weapon[.]" 720 ILCS 5/12--14(a)(1) (West 2002).

Relevant here, an individual commits the offense of criminal sexual assault if he or she "commits an act of sexual penetration by the use of force or threat of force." 720 ILCS 5/12--13(a)(1) (West 2002).

In this case, defendant admitted to committing an act of sexual penetration with Sherry. Moreover, the State presented overwhelming evidence that defendant's conduct was accompanied by the use of force or threat of force in that defendant displayed, threatened to use, or used a knife in the commission of the offense. According to Sherry, in April 2003, defendant drove her to a dark,

empty parking lot and approached the passenger side of the vehicle with a knife in his right hand. Sherry stated that the blade of the knife measured five or six inches. At that point, defendant opened the door, instructed Sherry to leave the vehicle, and told Sherry to put her hands up and not to scream or say anything. Defendant proceeded to penetrate Sweat orally, vaginally, and anally. Danielle and Stacey testified to a similar series of events involving defendant, including the use of a knife. Although defendant questions Sherry's, Danielle's, and Stacey's versions of events, which he characterizes as "testimony from three prostitutes, two of whom were admitted cocaine addicts with criminal records," the jury was aware of the women's stations in life. It is the function of the jury to weigh the witnesses' testimony and assess their credibility. People v. Flowers, 306 Ill. App. 3d 259, 266 (1999). In any event, the women's stories find corroboration in other evidence presented at defendant's trial.

In particular, defendant provided police with two written statements on April 23, 2003, which were read to the jury. In the first statement, defendant admitted picking up a prostitute in April 2003. According to defendant, he and the prostitute agreed upon a price for sex. After he paid the woman, however, she balked, stating that she would not "do anything" unless defendant paid her more money. At that point, defendant pulled out a knife with a folding five-inch blade and told the woman to take off her clothes. The woman complied, and defendant put away the knife. Defendant proceeded to penetrate the woman vaginally and anally. In the second statement, defendant explained that as a result of certain life events, he wanted to die, so he decided to contract AIDS. To accomplish his goal, defendant began having unprotected sex with prostitutes. At some point, defendant began to force the prostitutes to have sex with him, because he did not have any money.

Defendant would drive the women to a secluded location and show them a knife. These statements corroborate the women's stories. Moreover, Frank Ciprys testified that Sherry showed up at his doorstep shortly after midnight on April 17, 2003, repeatedly stating that she had been "raped in the ass" and that the attacker had a knife. This evidence also corroborates that Sherry's encounter with defendant was not consensual. While defendant points out that no one noted any cuts on Sherry, the statute under which defendant was convicted allows for a conviction of aggravated criminal sexual assault if the accused "display[s]" or "threaten[s] to use" a dangerous weapon. 720 ILCS 5/12--14(a)(1) (West 2002). Given the strong case for defendant's guilt, we cannot say that there is doubt as to whether the jury would have rendered a guilty verdict absent the improper comments. Accordingly, we find no reversible error.

Defendant also argues that because the prosecutor in this case "indulged in improper appeals to sympathy" on previous occasions (see People v. Clarke, 245 Ill. App. 3d 99 (1993); Slaubaugh, 323 Ill. App. 3d 723; Libberton, 346 Ill. App. 3d 912) and has failed to heed admonishments that he not do so, we should reverse defendant's conviction and remand for a new trial. We decline defendant's invitation.

Our supreme court has noted that a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain-error doctrine. People v. Johnson, 208 Ill. 2d 53, 64 (2003). However, as we pointed out in Libberton, "nowhere in Johnson did the court indicate that prior admonishments to the prosecutor regarding his improper comments in other cases are appropriately considered in deciding a pattern of intentional misconduct exists in the trial being reviewed." Libberton, 346 Ill. App. 3d at 938 (supplemental

opinion on rehearing). Moreover, the isolated improper comments during the State's rebuttal closing argument can hardly be characterized as a pattern of prosecutorial misconduct like that referenced in Johnson. Defendant asserts that assistant State's Attorney Weber's words were the last the jury heard from either party before retiring to deliberate. While that is true, the jurors were instructed that neither sympathy nor prejudice should influence them, that the evidence they should consider consists only of the testimony of the witnesses and the exhibits the court received, that closing arguments are not evidence, and that any portion of closing arguments not based on the evidence should be disregarded. See People v. Desantiago, 365 Ill. App. 3d 855, 865 (2006) (concluding that trial court's instruction that closing argument does not constitute evidence mitigates any potential prejudice arising from improper closing argument). As such, we cannot say that the impropriety in the State's argument was of such magnitude as to deprive defendant of a fair trial. Nevertheless, we reiterate that we do not approve of the complained-of remarks and we again urge trial judges to vigorously guard against such improper argument and unprofessional conduct. See Libberton, 346 Ill. App. 3d at 927 (Hutchinson, J., dissenting), 939 (supplemental opinion on rehearing).

Finally, having found that the comments identified by defendant did not deprive him of a fair trial, we reject defendant's alternate claim that defense counsel was ineffective for failing to challenge the remarks. See Starnes, slip op. at 5-6.

### III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of Winnebago County.

Affirmed.

O'MALLEY and CALLUM, JJ., concur.