# Illinois Official Reports

## Appellate Court

---

### *People v. McNeal*, 2019 IL App (1st) 180015

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ARTEZ McNEAL, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>No. 1-18-0015 |
| Filed | December 31, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 17-CR-1246; the Hon. Ursula Walowski, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | James E. Chadd, Patricia Mysza, and Bridget Geraghty, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People. |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Justices Reyes and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1 After a jury trial, defendant Artez McNeal was convicted of being an armed habitual criminal and sentenced to 10 years with the Illinois Department of Corrections (IDOC).

¶ 2 In this appeal, defendant claims, first, that the trial court erred when it allowed Officer Thomas Ellerbeck to testify, based on his own experience of having examined 1800 firearms, that it was rare to recover latent fingerprints from a gun. Second, defendant claims that the State committed prosecutorial misconduct in closing argument and opening statement by making inflammatory and burden-shifting arguments.

¶ 3 For the following reasons, we affirm.

I. BACKGROUND

¶ 4

¶ 5 The evidence at trial established that, on December 28, 2016, at 9 p.m., a group of police officers were patrolling an area in Chicago known for gang activity and drug sales. As Officer Michael Callahan's vehicle drove by an apartment complex, he observed a group of five to eight men standing in the courtyard of the complex, approximately 70 to 75 feet away from his vehicle. Although his Crown Victoria lacked a police logo, Officer Callahan testified that it was "like a regular police car you see" with two spot lights, "M" or municipal plates, and white bars, all indicating that it was a police vehicle. One of the men, who was later identified as defendant, looked toward Officer Callahan's vehicle, immediately turned, grabbed his right side, and ran. Officer Callahan exited his vehicle and chased defendant, who entered an apartment building. Defendant ran through two doors and into the first-floor hallway, but Officer Callahan was stopped by the second door, which was locked. Looking through a glass panel in the locked door, Officer Callahan observed defendant approach the last apartment off the hallway. During this time, Officer Callahan did not observe the handle of a gun sticking out of defendant's pocket.

¶ 6 However, believing that defendant was in possession of a gun, Callahan had previously radioed Officer Ralph Mionskowski, who had approached the building from the other side. Thus, Officer Callahan was on the north side of the building, while Officer Mionskowski was on the south side of the building. Both officers were looking through glass panels in the building's doors, but on opposite ends of the building's main hallway.

¶ 7 From his vantage point, Officer Mionskowski observed defendant approach the apartment and knock on its door, which was five feet from Officer Mionskowski. Before the apartment door opened and before defendant entered, Officer Mionskowski was able to observe defendant for eight seconds. Mionskowski testified that, during that time, he "observed in his right pants pocket a handle of a gun protruding from his pocket." Mionskowski testified that the handle was brown and wooden, and that he "basically saw the whole handle from where his pants stopped, so it was basically just a handle end sticking from his pocket." There were no objections to Mionskowski's testimony that the object was a gun.

¶ 8 As defendant was entering the apartment, Officer Callahan gained entry by pressing a buzzer and ran down the hallway to let Officer Mionskowski into the building. Officer Callahan testified that he "bang[ed]" on the apartment door and defendant opened it. Officer Mionskowski estimated that only 30 seconds had elapsed between when defendant entered the apartment and when he opened the door for the officers. While defendant was detained in the

hallway by Officer Mionskowski, Officer Callahan entered the apartment, where he observed an approximately 20-year-old woman and a couple of children. Officer Callahan testified, without objection, that, after speaking to the woman, he went to the back bedroom, which contained toys, children's clothes, and a child's bed and comforter. When asked if he searched the room, Officer Callahan replied that he "just looked under the bed," where he observed and retrieved a brown-handled, Western Ranger, .22-caliber revolver. Officer Callahan explained that he recovered the gun without gloves because of "the situation, the apartment wasn't secure, there were children around" and he "figured it would be best to pick it up right away." After Officer Callahan exited the apartment with the gun, Officer Mionskowski recognized that it was the same gun that he had previously observed sticking out of defendant's pants pocket. When asked how he recognized the gun, Officer Mionskowski, an 18-year veteran with the Chicago police force, explained: "It's very distinctive, the wooden handle." Thus, Officer Mionskowski recognized the same wooden handle that he had previously observed sticking out of defendant's pocket. Also, Officer Mionskowski testified that the hallway had "very good artificial lighting."

¶ 9    The last and third witness was Officer Thomas Ellerbeck, who was qualified as an expert in the field of "latent print development and recovery." Officer Ellerbeck testified that he had been employed for 20 years with the Chicago Police Department and 12 years with the Forensics Services Division and had worked for the last five years in "latent print development and recovery." Ellerbeck received evidence "on a daily basis" that he examined for the presence of latent fingerprints. Twelve years ago, when he became an evidence technician, he received training from the Illinois State Police crime lab and the Chicago Police crime ab. After a probationary period, he processed crime scenes, including recovering hundreds of fingerprints. After seven years, he began working as an evidence technician in his current section, "the latent print development and recovery section." After a year-long probationary period, he was permitted to work on his own cases and examined "approximately 1800 firearms for latent prints" and examined "bullets hundreds of times." Ellerbeck previously testified as an expert witness in latent print development and recovery at least 16 times. At trial, when the court asked if the defense had any objection or desire to inquire further, counsel responded, "Judge, I have no objection, but preserve the pretrial issue."

¶ 10    Prior to trial, defendant had filed a motion *in limine* to bar Ellerbeck from testifying about the guns he had tested in other cases. Defendant sought to bar any testimony from Ellerbeck concerning (1) any testing of firearms that were not the weapon recovered in this case and (2) statistics about how many guns that are tested yield fingerprints. Defendant also claimed that "there has been no basis provided for any opinion as to why there are no fingerprints on the weapon in question and it would be improper for a State's witness to testify as to the absence of evidence connecting this defendant to the crime alleged." The trial court denied the pretrial motion, finding that, if Officer Ellerbeck is

> "qualified as an expert in testing analysis of firearms, he could obviously testify to his own experiences. He doesn't have to be an expert in statistics or studies, but he could certainly testify to *** his experience as an expert, what he's tested, how many times, and what has come up positive. I don't see any issue of that being irrelevant or too prejudicial ***."

The trial court further stated:

"[I]f Mr. Ellerbeck is qualified as an expert in firearms, he could testify as to his experience of how he recovers fingerprints, what he does, what his experiences were, what kind of surfaces can or cannot get fingerprints, how fingerprints would not be found, these are all within his expertise as long as he's qualified."

¶ 11 Ellerbeck testified at trial that he did not find any latent prints on the gun or on six .22-caliber bullets that he received in the same envelope with the gun. Ellerbeck explained what a latent print was and the steps that he normally undertakes to look for prints and that he also took with respect to this gun and these bullets.

¶ 12 When Ellerbeck was asked, out of the 1800 times he had examined guns, how many times he had recovered prints, defense counsel objected, stating: "Judge, objection. I believe this is beyond the scope of his expertise." After the trial court overruled the objection, Ellerbeck testified:

"So I've examined over 1800 firearms approximately. And in my education and experience, I've determined that it's extremely rare to find a suitable identifiable ridged impression on a firearm. But out of those 1800 times, only approximately 61 times [was I] able to find a ridged impression that was identified."

¶ 13 Ellerbeck then explained why this gun, in particular, was not conducive to the retention of prints. First, he noted: "The grip is a wooden grip. And wood is a porous surface which absorbs moisture. So the moisture would not be left at the top of the surface. And *** a fingerprint is the moisture from our hands. So the wood would absorb that moisture."

¶ 14 Second, Ellerbeck observed that the trigger on this gun was "a curved small surface area" with "a groove along the curve." As a result, "it's a very small surface area for any ridged impression to be present." "[F]or a ridged impression to be identified, you need a larger surface than a trigger."

¶ 15 Third, the gun was a blue steel handgun. Ellerbeck explained that a "blue'ing coat" was "placed on a gun to prevent rust" and "rust is caused by moisture." Thus, the gun was made to resist the moisture that would leave a print.

¶ 16 Fourth, the cylinder had several grooves in order to provide a good grip, but that meant that it was not a smooth area for prints.

¶ 17 Fifth, since it was a heavy handgun, a person would use "an enormous amount of pressure to handle this handgun creating pressure distortion." Ellerbeck explained that pressure distortion meant that the person holding the weapon was creating "smudges," instead of "a nice smooth impression that's going to be readable and identifiable."

¶ 18 Ellerbeck was asked how many times he had examined bullets for the presence of latent prints. This time he answered, "thousands." Earlier in his testimony, he had answered "hundreds." When he was asked how many times he had located a latent print on a bullet, defense counsel objected, stating that he "renewed [his] objection." After the trial court overruled the objection, Ellerbeck answered, "under five times I've located an identifiable print on a bullet." When asked why a bullet tends not to retain a print, Ellerbeck answered: "In this case, these bullets are extremely small and round. *** These are small surface areas, and you need a large enough area for an impression to be placed on so that there's enough detail to allow it be identified."

¶ 19 Lastly on direct examination, Ellerbeck testified that, if a gun was pulled out of a pocket, that action could wipe away a print.

¶ 20	On cross, when asked whether his unit had been accredited by any national organization, Ellerbeck testified that "[w]e don't have any accreditation." When defense counsel asked whether any national organization "validated" the testing methods used to test the weapon, Ellerbeck responded that "[t]he testing that we use is recognized and accepted by most labs throughout the United States." Defense counsel pressed, "But nobody has validated those test[s] from a national organization, right?" Ellerbeck responded that he "[didn't] know what you mean by that." Ellerbeck testified that he read "literature and follow[ed] studies on latent print development."

¶ 21	The parties stipulated that defendant had two prior qualifying felony convictions. After listening to closing arguments and jury instructions, the jury deliberated and found defendant guilty of being an armed habitual criminal.

¶ 22	On August 29, 2017, the defense filed a posttrial motion for a new trial that alleged, among other things, that

> "[t]he Court erred when it denied [defendant's] pretrial motion to exclude testimony regarding how difficult and/or unusual it is to recover fingerprints from a weapon and it erred when it overruled defense objections at trial regarding the statistics testified to by Ellerbeck, which were not substantiated by any expertise in statistics."

On October 25, 2017, the defense filed a revised posttrial motion that included cites and quotes from the record.

¶ 23	On November 20, 2017, the trial court denied defendant's posttrial motion for a new trial. After considering factors in mitigation and aggravation and observing that the sentencing range was 6 to 30 years, the trial court sentenced defendant, age 27, to 10 years with IDOC. On December 4, 2017, defendant filed a motion to reconsider his sentence which was denied the same day. Also on December 4, 2017, a notice of appeal was filed. This timely appeal followed.

¶ 24	II. ANALYSIS
¶ 25	A. Expert Testimony
¶ 26	Defendant claims, first, that the trial court erred when it allowed Officer Ellerbeck to testify, based on his own experience of having examined 1800 guns, that it was rare to recover latent fingerprints from a gun, where (1) he did not testify that he was certified as a latent print examiner, (2) his lab was not accredited, (3) the State presented no evidence from a peer-reviewed study or a larger database to support his conclusion, and (4) the State did not establish that his testing had been subjected to peer review or had met the standards of a national organization. Second, defendant claims that, without any testimony about how these other 1800 guns were handled, the testimony about the lack of prints found on them was irrelevant. Third, defendant argues that, even if this testimony was marginally relevant, the unfair prejudice substantially outweighed any probative value.

¶ 27	Defendant's first argument attacks the officer's expertise. In its brief to this court, defendant criticizes the officer's "background and experience" as "consist[ing] primarily of apprenticeship and on the job training." Instead, defendant argues there should have been peer-reviewed studies or a database.

¶ 28	The admission of evidence is within the sound discretion of a trial court, and a reviewing court will not reverse the trial court absent an abuse of that discretion. *People v. Ciborowski*, 2016 IL App (1st) 143352, ¶ 88; *People v. Carlisle*, 2015 IL App (1st) 131144, ¶ 63. An abuse

of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable person would take the position adopted by the trial court. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88; *Carlisle*, 2015 IL App (1st) 131144, ¶ 63. Decisions of whether to admit expert testimony are generally reviewed using this same abuse of discretion standard. *Ciborowski*, 2016 IL App (1st) 143352, ¶ 88.

¶ 29    However, the admission of an expert's testimony requires an adequate foundation establishing that the information upon which the expert bases his or her opinion is reliable. *People v. Garcia*, 2012 IL App (1st) 103590, ¶ 107. While it is the function of the trial court to determine whether the foundational requirements have been met, that determination presents a question of law. *Garcia*, 2012 IL App (1st) 103590, ¶ 107. As such, it is reviewed *de novo*. *Garcia*, 2012 IL App (1st) 103590, ¶ 107. *De novo* consideration means that the reviewing court performs the same analysis that a trial judge would perform. *Garcia*, 2012 IL App (1st) 103590, ¶ 107. Under either a *de novo* or an abuse-of-discretion standard of review, our finding in this case would be the same.

¶ 30    Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) provides that a witness may be qualified as an expert based on "knowledge, skill, experience, training or education." There is " 'no predetermined formula' " for how an expert becomes an expert, and an expert may become an expert through practical experience alone. *Thompson v. Gordon*, 221 Ill. 2d 414, 428-29 (2006). Formal academic training or specific degrees are not required. *Gordon*, 221 Ill. 2d at 429. To be qualified as an expert in a particular field, a person "need only have knowledge and experience beyond that of an average citizen." *Gordon*, 221 Ill. 2d at 429. Thus, for example, a witness was not required to be licensed as an engineer in the State of Illinois in order to testify as an expert in engineering. *Gordon*, 221 Ill. 2d at 429. Licensing could be a factor that a court considers, but it is not a prerequisite. *Gordon*, 221 Ill. 2d at 429.

¶ 31    "[T]he weight to be assigned to an expert opinion is for the jury to determine in light of the expert's credentials and the factual basis of his opinion." *Snelson v. Kamm*, 204 Ill. 2d 1, 26 (2003). Even when the admission of evidence is in error, we may affirm if the error was harmless beyond a reasonable doubt. *In re E.H.*, 224 Ill. 2d 172, 180 (2006).

¶ 32    In the case at bar, it is important to distinguish what is, and is not, in dispute. First, defendant does not dispute that Officer Ellerbeck's field, namely, "latent print development and recovery," is a legitimate field of expertise. This field is neither fingerprint comparison nor identification, but simply the physical recovery of the prints themselves. Thus, it is not subject to the criticisms frequently leveled at the field of fingerprint identification or comparison, and defendant's citation of *People v. Safford*, 392 Ill. App. 3d 212 (2009), is inapposite. See *Safford*, 392 Ill. App. 3d at 224 (latent print examiner's testimony should not have been admitted where he failed to sufficiently explain how he found "a match"); *People v. Campbell*, 146 Ill. 2d 363, 384 (1992) (fingerprint evidence has been admitted in some cases where the expert found only four points of comparison). Second, defendant raises a very limited challenge to Officer Ellerbeck's expertise. Defendant does not dispute on appeal, and did not dispute at trial, Officer Ellerbeck's ability to testify that he examined the gun and bullets in this case and recovered no fingerprints from them. Defendant objects to Ellerbeck's testimony that prints are rarely found on guns in general, and defendant argues that the trial court should have barred Ellerbeck from testifying about his experience with guns in other cases and about *why* no prints were found on this gun.

¶ 33    First, on appeal, as in the court below, defendant argues that Ellerbeck's conclusions should have been based on data or statistics from a peer-reviewed study or database, rather than simply his or her own experience. However, an expert may testify based on his or her practical experience alone (*Gordon*, 221 Ill. 2d at 428-29), and arguments about the persuasiveness of his or her conclusions go to weight not admissibility (*Snelson*, 204 Ill. 2d at 26). Thus, we can find no reason to bar his detailed testimony about this gun and the characteristics about it that would make it unlikely to yield a fingerprint. *Snelson*, 204 Ill. 2d at 26 ("the basis for a witness' opinion generally does not affect his standing as an expert; such matters go only to the weight of the evidence, not its sufficiency").

¶ 34    Second, even if Ellerbeck had been barred from testifying about how few times he had found prints on other guns, Ellerbeck provided five different reasons why prints were not found on this particular gun. Ellerbeck went over the physical parts of *this* gun, part by part, explaining why each part would not be expected to yield a print suitable for comparison. Thus, any error in admitting his testimony about the lack of prints on the other 1800 guns was harmless beyond a reasonable doubt (*In re E.H.*, 224 Ill. 2d at 180), and any prejudice was minimal. Ill. R. Evid. 403 (eff. Jan. 1, 2011) ("evidence may be excluded if its probative value is *substantially* outweighed by the danger of unfair prejudice" (emphasis added)).

¶ 35    In addition, while defendant objects to Officer Ellerbeck's testimony about *why* prints were not found on the gun, defendant did not object to Officer Ellerbeck's testimony that he found no prints at all on the gun. This testimony, which was not objected to, combined with Officer Callahan's testimony that he had seized and handled the gun without gloves, demonstrated that one could grab and handle this gun without leaving prints. For this reason as well, even if there was any error in admitting Officer Ellerbeck's explanation about why the gun was not conducive to prints, such error would have been harmless and had no effect on defendant's conviction.

¶ 36    Defendant argues that Ellerbeck's conclusions should not have been admitted because his latent print recovery unit was not accredited and he was not certified by a national organization in print recovery. However, there is no evidence in the record that there *is* accreditation for solely a recovery unit—as opposed to a unit for examination, comparison, and identification— or a national organization that certifies experts in recovery alone. Normally, the term, latent print "[e]xaminer," refers to someone who *compares* prints in order to find a "match." *E.g.*, *Safford*, 392 Ill. App. 3d at 224. Ellerbeck was not an examiner in this sense; rather, he was simply an evidence technician who attempted to recover prints from objects.

¶ 37    Even if accreditation or licensing was available in the field of recovery alone, it would have been just one factor to consider concerning Ellerbeck's qualifications, not a prerequisite. *Gordon*, 221 Ill. 2d at 429. It might be a different case if his unit was accredited or licensed and then lost that accreditation or license. However, no such argument was made here.

¶ 38    Defendant argues that Ellerbeck's testimony about the lack of prints in other cases was not relevant because he did not testify about the handling of the guns in those 1800 cases, such that the jury could decide whether the cases were similar. Ellerbeck could testify about his years of experience attempting to recover prints from guns. The fact that he did not know about a gun's handling and storage prior to its delivery to his unit was grist for cross-examination but went to weight, not admissibility. *Snelson*, 204 Ill. 2d at 26.

¶ 39    For all the foregoing reasons, we do not find persuasive defendant's arguments concerning Officer Ellerbeck, and find that the trial court did not err in admitting his testimony.

¶ 40                                    B. State's Opening and Closing

¶ 41    Next, defendant claims that the State committed prosecutorial misconduct by making inflammatory and burden-shifting arguments during both opening statements and closing arguments.

¶ 42                                        1. Standard of Review

¶ 43    While the State has wide latitude in both its opening statements and closing arguments and may comment on the evidence, it is still improper for the State to make comments that have no other purpose than to arouse the prejudices and passions of the jury. *People v. Jones*, 2016 IL App (1st) 141008, ¶ 21; *People v. Herndon*, 2015 IL App (1st) 123375, ¶ 36 ("[i]t is improper for a prosecutor to make comments irrelevant to the question of guilt or innocence and that only serve to inflame the jury's passions"); *People v. Schneider*, 375 Ill. App. 3d 734, 755 (2007) ("the prosecutor's exhortations" to the jury to "have some compassion for the victim" were improper). Even if the remarks were inappropriate, reversal is required only if they engendered such substantial prejudice against the defendant that it is impossible to tell whether the verdict of guilt resulted from them. *People v. Wheeler*, 226 Ill. 2d 92, 123 (2007); *People v. Johnson*, 119 Ill. 2d 119, 139-40 (1987); *Jones*, 2016 IL App (1st) 141008, ¶ 23. If the reviewing court cannot determine whether the prosecutor's improper remarks contributed to the defendant's conviction, then it must grant a new trial. *Wheeler*, 226 Ill. 2d at 123; *Jones*, 2016 IL App (1st) 141008, ¶ 23.

¶ 44    This court has applied, in different cases, both a *de novo* standard and an abuse-of-discretion standard[1] when reviewing a prosecutor's opening statement. Compare, *e.g.*, *People v. Deloney*, 359 Ill. App. 3d 458, 470 (2005) ("generally left to the circuit court's discretion"), with *Jones*, 2016 IL App (1st) 141008, ¶ 23 ("*de novo*"). Similarly, "[t]his court has noted confusion regarding the appropriate standard of review regarding alleged errors occurring during closing arguments." *People v. Johnson*, 2015 IL App (1st) 123249, ¶ 39; see also *People v. Boston*, 2018 IL App (1st) 140369, ¶ 82; *People v. Johnson*, 385 Ill. App. 3d 585, 603 (2008) ("Since *Wheeler*, appellate courts have been divided regarding the appropriate standard of review."). In the case at bar, we need not resolve this dispute because the outcome would be the same under either standard of review, as we explain below.

¶ 45                                      2. Woman in Apartment

¶ 46    First, defendant claims that the State committed prosecutorial misconduct when the prosecutor argued, in both opening statement and closing argument, about a nontestifying witness, namely, the 20-year-old woman in the apartment.

¶ 47    Officer Callahan testified at trial, without objection, that, after speaking to the woman, he went to the back bedroom, which contained children's toys and clothes. When asked if he searched the room, Officer Callahan replied that he "just looked under the bed," where he observed and retrieved the brown-handled gun.

---

[1]Both of these standards were defined in the section above.

- 8 -

¶ 48        Based on this anticipated testimony, the prosecutor had argued, without objection, during the State's opening statement:

> "You'll hear how the officers detained [defendant] right there and talked to a woman who was inside of the apartment, and after talking to that woman, they went into a room, this room that was in that apartment, and you'll hear them describe what the room looks like. And you'll hear how it looked like a child's room, and they looked underneath the bed, and there right underneath the bed, nothing covering it up, was that gun with the big brown handle."

¶ 49        Similarly, in closing argument, based on the above testimony, the prosecutor argued, without objection: "Officer Callahan goes in, speaks to that woman, after speaking to her, *he knows where to go*, he goes right to that bedroom, and there he recovers the gun." (Emphasis added.) In his brief to this court, defendant quoted this sentence and italicized this same portion.

¶ 50        Both of the above-quoted statements in opening and closing arguments were not objected to by counsel. The italicized portion of the above quote was a reasonable inference drawn from the facts in evidence. It was reasonable to infer that the officer knew where to go from his testimony that he "just looked under the bed" and retrieved the gun. "Arguments and statements that are based upon the facts in evidence, or upon reasonable inferences drawn there from, are within the scope of closing argument." *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 62. Thus, we cannot find that the prosecutor committed misconduct by restating evidence that was not objected to and drawing a reasonable inference from that evidence. *People v. Gonzalez*, 388 Ill. App. 3d 566, 595 (2008) (we could find no prosecutorial misconduct in the State's closing argument where the prosecutor commented on the evidence and drew reasonable inferences from it).

¶ 51                                    3. Burden Shifting

¶ 52        Second, defendant claims that the State committed prosecutorial misconduct when it shifted the burden of calling witnesses to defendant by arguing that the woman was a friend of defendant. "[T]he defendant is under no obligation to produce any evidence, and the burden of proof never shifts to the defendant but remains the responsibility of the State throughout the trial." *People v. Murray*, 2019 IL 123289, ¶ 28. "The State has the burden of proving every element of a criminal offense beyond a reasonable doubt, and may not attempt to shift that burden to a defendant in closing argument." *People v. Parker*, 2019 IL App (3d) 160455, ¶ 67.

¶ 53        In support of this claim, defendant relies primarily on *People v. Brown*, 122 Ill. App. 3d 452, 459 (1984), which observed: "it is ordinarily error for a prosecutor to comment upon absent witnesses when such witnesses are equally accessible to the State." However, in *Brown*, the court found no error, since "[a] defendant cannot ordinarily claim error where the prosecutor's remarks are in reply to, and may be said to have been invited by, defense counsel's argument." *Brown*, 122 Ill. App. 3d at 459. While "permissible comment by a prosecutor on an absent alibi witness cannot include misleading, unfair, or unduly prejudicial content," the *Brown* court found no error where "the prosecutor's comments were invited by, and in proper rebuttal to, defense counsel's remarks." *Brown*, 122 Ill. App. 3d at 460.

¶ 54        In the case at bar, the defense argued in closing:

> "No one told you that [defendant] was ever in that bedroom, nobody, and they could have brought in the woman whose apartment that was who was there, but she didn't

- 9 -

come in here, we didn't hear that testimony. It's another unanswered question, and that's not my responsibility to fill it in because it is not [defendant's] burden to prove himself innocent. It is the State's burden to prove him guilty."

¶ 55 In rebuttal, the State argued: "Counsel also asked there was a civilian, the civilian's not here. Well let's think about this, who is this civilian, who is this person to the defendant? Because what we know about her, okay." Defense counsel then objected. The trial court overruled the objection, stating: "Overruled. He may argue. Once again, ladies and gentlemen, what the lawyers say is not evidence go ahead."

¶ 56 The prosecutor continued:

"When he needs to hide and he needs to stash a gun, where does he go when he's being chased by the police, and he knows he needs to get in somewhere fast, and someone's going to let him in, where does he go? He goes from this part of the courtyard *** he doesn't run to any of these buildings *** he runs to a particular building *** where he could get in. And when he goes in there, he runs down a hallway, and he's not running down a hallway trying the doors *** he goes straight to [this apartment] where he knows he could get in because he knows this person that's here, he knows this person will let him in, he knows the layout, he knows where it is. This is his friend, this person."

¶ 57 Defense counsel again objected, and the trial court again overruled it, again instructing the jurors that "what the lawyers say is not evidence."

¶ 58 The State continued: "So who is this person, this civilian, it's somebody he knows, it's somebody who will let him in and let him hide something in that apartment, that's who this person is that we're talking about."

¶ 59 Based on the above statements, defendant claims that the State was arguing that defendant had special access to this witness and, thereby, shifted the burden of calling her as a witness to the defense, over the defense's objections. *People v. Euell*, 2012 IL App (2d) 101130, ¶ 20 (by commenting in closing argument on what defense counsel should have done but did not, "the State effectively shifted the burden to defendant to elicit exculpatory evidence").

¶ 60 However, the fact that defendant, when chased by the police, made a beeline to this particular apartment and was immediately admitted was a fact established by the testimony at trial. From this evidence, the jury and the prosecutor could reasonably draw the inference that defendant knew and was friends with its occupant. While defendant argues that this inference was an attempt at burden-shifting, it could also be considered an explanation by the State as to why it did not bother calling her as a witness. *Euell*, 2012 IL App (2d) 101130, ¶ 20 (when "statements could be construed as proper argument *** rather than improperly implying that defendant had a duty" to present evidence, it does not constitute burden-shifting). Certainly, the prosecutor's tone of voice and any emphasis placed on particular words could have shifted the balance one way or the other. However, the trial court, who heard the State's remarks first-hand, chose to overrule the defense's objections, and we cannot find a reason from this cold transcript to find an error in that decision. *People v. Taylor*, 2019 IL App (3d) 160708, ¶ 43 (the trial court is in the best position to evaluate the propriety of closing arguments, in light of its ability to make "first-person observations").

¶ 61                                    4. Child's Bedroom

¶ 62        Defendant argues that the State improperly inflamed the passions of the jury by emphasizing that the gun was found in a child's bedroom. Although prosecutors are afforded wide latitude in closing argument, the argument must serve a purpose other than inflaming the passions of the jury. *People v. Darr*, 2018 IL App (3d) 150562, ¶ 71. "[I]nflaming of the jury's passions is not directly barred; rather any commentary that does so must also serve a different proper purpose." *Darr*, 2018 IL App (3d) 150562, ¶ 71; *People v. Blue*, 189 Ill. 2d 99, 128 (2000) ("argument that serves no [other] purpose but to inflame the jury constitutes error").

¶ 63        Prior to trial, defendant filed a motion *in limine*, seeking to bar "[a]ny testimony that the apartment where the gun was recovered had children in the home, specifically that the bedroom where the gun was recovered was a child's bedroom; because this testimony is irrelevant to whether the defendant possessed the weapon and is highly prejudicial while offering nothing probative."

¶ 64        At the pretrial hearing on the motion, defense counsel explained: "our objection focuses on the bedroom where the gun was recovered was a child's bedroom. The only thing that matters is that it was recovered in a bedroom under a bed, whether or not a child or an adult lived in that room is not relevant."

¶ 65        The trial court then ruled as follows:

> "Well, does anybody know whether a child—any of the officers actually know whether a child or an adult lived in that room or simply that they observed a, you know, a pink blanket, a Teddy bear, I mean they could *** certainly testify as to what they see in the room. I guess the conclusion that it's a child room is not going to be allowed, but certainly they could testify to what they found or describing the room and the picture of the room where the gun was recovered is going to be allowed, so that will be allowed, okay."

¶ 66        During the State's opening, the prosecutor argued to the jury, without objection, that "you'll hear how it looked like a child's room."

¶ 67        During the State's closing argument, the prosecutor argued, without objection, that, after speaking to the woman in the apartment, Officer Callahan "goes right to that bedroom with all that kids stuff in there, and he goes there because that's where the defendant put up that gun, he put it under in a kid's room underneath the bed, to try to get it away from himself." The prosecutor argued that that is not where "anybody who lives there is going to store the gun." Thus, "[t]hat's how you know it was the defendant who is the one who possessed the gun that night."

¶ 68        During the State's rebuttal closing argument, the prosecutor argued:

> "The fact that it's in a kid's room, in a kid's room, he puts it in a place where he'd hoped that the police wouldn't go in there, they're not going to go look in a kid's room, a kid's not going to have it. It's kind of like one of those [H]ighlight magazine[s], you know on the back cover, what's wrong with this picture. You look into a child's room and there's a stuffed animal."

Defense counsel objected, and the trial court overruled it, stating that the prosecutor "may argue." The court cautioned, "Once again, ladies and gentlemen, what the lawyers say is not evidence."

¶ 69 The prosecutor continued: "Kid's comforter, kids clothes, and a big gun out in the open underneath the bed. What's wrong with this picture? He put it there, hoping the police wouldn't find it, but they did."

¶ 70 When denying defendant's posttrial motion for a new trial, the trial court ruled:

"I don't see anything in the record where the officer violated the motion *in limine*. The officer [*sic*] I believe what I ruled was that the officer cannot testify that it was a kid's room. But the officer could certainly testify to what he saw in the room. And that's what was done. I don't see anything in the record where the officer gave an opinion about the room. The State however in closing argument did argue that it was a child's room but that is proper argument."

¶ 71 On appeal, defendant argues that the State's references to children violated the trial court's pretrial ruling and served no other purpose but to inflame the jury. First, the trial court's pretrial ruling was that the officer could not testify as to his own opinion or conclusion about the character of the room. Most of the State's remarks went unobjected to, and the trial court overruled the two objections, indicating that the State's argument did not violate its pretrial ruling. Second, the State's references to a child's bedroom did serve a legitimate purpose. They furthered the State's arguments that (1) no occupant of that room or of that apartment would have placed a gun there, and thus, the gun must have been placed there by someone else—such as defendant who had just run in and (2) a child's room is the last place that someone would ordinarily look for or store a gun, and thus, it must have been placed there by someone seeking to hide it—such as defendant. As a result, we do not find persuasive defendant's claim that these comments served no purpose other than to inflame the jury. *Darr*, 2018 IL App (3d) 150562, ¶ 72 (no error where "the comments that defendant claims served only to inflame the passions of the jury also served purposes *** important to the State's case").

¶ 72 Although the trial court found that the State did not violate the motion *in limine*, we find that the State did. The trial court should not have granted the motion *in limine* in the first place because the evidence showed that the items found in the bedroom would indicate it was a child's bedroom. However, the comment by the State that it was a child's bedroom did serve a legitimate purpose, as we have explained, and any error by the State would have been harmless, as the comment was not designed to inflame the passions of the jury.

¶ 73                                5. Story About Daughter

¶ 74 Lastly, defendant claims that the prosecutor attacked defense counsel by invoking the prosecutor's own three-year-old daughter.

¶ 75 In the defense closing, counsel argued that the officer's testimony was not corroborated by "footage from a body camera." Counsel then argued: "I mentioned that there's zero footage from a body camera. But also think about it, this is CHA, Chicago Housing Authority Development, obviously a governmental property, and they don't come in here with any footage from any cameras to back up what we're told here today."

¶ 76 In rebuttal, the State gave the following response, which defendant quoted in full in its appellate brief, as follows:

"The other day, I have a little daughter, she's three, and I made dinner, and we're just about to eat dinner, and my wife was going out to meet some friend at that point in time. So my wife and my daughter are at the front door, and I'm in a little hallway

away, I could see them and hear them talking to each other. I said time for di[nn]er, and my wife says—it's my daughter, and I could see her and I could hear her, she says to her, you know, go eat dinner, if you do a good job, you know, dad will give you a cookie, and so my daughter gets all excited. She runs down to me, and she says dad, dad, did you hear that. I said what. And she said mom said I could have a cookie and I don't have to eat my dinner. I said that's not what she said. Yeah, it is. I said no, she said you need to eat your dinner and if you do a g[ood] job, you could have a cookie. No, it's not. But that's what she said to me. Now, that whole thing wasn't captured on camera, but I saw it and I heard it. They're like my daughter, trying to convince us that because there's not a camera, because there isn't anything that's documented in a video format, we shouldn't believe it."

On appeal, defendant argues that the State was improperly comparing defense counsel to a toddler who lies to receive a cookie and that the story served no other purpose than to inflame the jury.

¶ 77    An attorney may use a personal, or even make-believe, story to make a point during closing arguments. See *Gonzalez*, 388 Ill. App. 3d at 595. For example, in *Gonzalez*, to make the point that witnesses' lapses in memory about a shooting were unbelievable, the defense counsel argued in closing that he recalled exactly where he was when John F. Kennedy was shot—to which, the prosecutor responded that, when the towers were hit on September 11, he remembered he was on his way to work, but he could not " 'for the life of me tell you what suit I was wearing.' " *Gonzalez*, 388 Ill. App. 3d at 595-96. Similarly, in the case at bar, the prosecutor's purpose was not to compare defense counsel to a toddler, but to argue that in the everyday events of our lives we make conclusions without the aid of videotapes. Thus, we cannot find that this bit of personal storytelling was intended to belittle defense counsel or inflame the passions of the jury.

¶ 78                                6. Cumulative Error

¶ 79    Defendant asks this court to consider the cumulative effect of the prosecutorial misconduct in this case. *People v. Clark*, 335 Ill. App. 3d 758, 767 (2002) ("In determining whether defendant was denied a fair trial, we may consider the cumulative effect of the errors that occurred."). However, we do not find any unfairly prejudicial, cumulative effect of the conduct of the prosecutor in this case that affected the conviction of defendant.

¶ 80                                    C. Plain Error

¶ 81    The State argues that defendant forfeited most of these issues by failing to preserve them in the court below and that we may review these issues only for plain error. In response, defendant argues that these issues were not forfeited. However, we need not determine whether these issues were, or were not forfeited, because the first step of any plain error analysis is to consider whether a clear or obvious error occurred (*People v. Sebby*, 2017 IL 119445, ¶ 49). For the reasons already discussed above, we find no errors at all.

¶ 82    However, if these issues were forfeited, we find that they did not constitute plain error. To preserve an error for appellate review, a defendant must both object at trial and raise the error in a posttrial motion; otherwise, it is considered forfeited. *Sebby*, 2017 IL 119445, ¶ 49. Even if an error is forfeited, we may still review it under the plain error doctrine. *Sebby*, 2017 IL 119445, ¶ 49. Under this doctrine, an error rises to the level of plain error if it is a clear or

obvious error and either (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *Sebby*, 2017 IL 119445, ¶ 49. In the case at bar, defendant asks us to consider any forfeited issues under the first, or closely-balanced, prong.

¶ 83 Even without considering the evidence challenged on appeal, we cannot find that the evidence at trial was closely balanced. Since defendant stipulated to the two prior qualifying felony convictions, the issue at trial was primarily whether he possessed a gun—and the evidence on that issue was not closely balanced. First, upon viewing a vehicle with spotlights, M plates and white bars, indicating that it was a police vehicle, defendant broke off from a group of men and fled. Flight is some evidence of a guilty mind. *E.g.*, *People v. Ross*, 2019 IL App (1st) 162341, ¶ 32 ("Defendant's flight from police also demonstrates consciousness of guilt."); *People v. James*, 2017 IL App (1st) 143036, ¶¶ 48-49 ("headlong flight from the police in a high-crime area" is a fact from which one can reasonably infer consciousness of guilt). Second, although Officer Callahan did not observe a gun during the ensuing chase, he did testify that the minute defendant viewed Officer Callahan's vehicle, defendant's immediate, almost gut reaction was to clutch his right side, where Officer Mionskowski subsequently observed that the gun was located. Third, standing only five feet from defendant, Officer Mionskowski viewed a gun with a distinctive brown, wooden handle sticking out of defendant's right pants pocket. Fourth, after entering the apartment that defendant entered seconds earlier, Officer Callahan retrieved a gun with a distinctive brown, wooden handle from under a bed. Officer Mionskowski estimated that only 30 seconds had elapsed between when defendant entered the apartment and when defendant opened the door for the officers. Fifth, Officer Mionskowski viewed the gun on the scene and identified it as the same gun that he had just observed in defendant's possession. Although another adult was present in the apartment, her presence did not diminish defendant's possession of the gun, which Officer Mionskowski had observed even before defendant entered the apartment. Officer Callahan's subsequent retrieval confirmed Officer Mionskowski's earlier observation of defendant's possession. Sixth, while defendant objects to Officer Ellerbeck's testimony about *why* prints were not found on the gun, defendant did not object to his testimony that no prints were found—and no prints were found, even though Officer Callahan testified that he had seized and handled the gun without gloves. Thus, testimony by Officer Ellerbeck that was not objected to, plus Officer Callahan's testimony, established that one could grab and handle this gun without leaving prints.

¶ 84 As a result, we cannot find that the evidence in this case was closely balanced.

¶ 85 III. CONCLUSION

¶ 86 For the foregoing reasons, we do not find defendant's claims persuasive and affirm his conviction and sentence.

¶ 87 Affirmed.