2023 IL App (1st) 211500-U

No. 1-21-1500

Order filed June 2, 2023

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 20 CR 9257 |
| | ) | |
| MICHAEL NEAL, | ) | Honorable |
| | ) | Timothy Joseph Joyce, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE C.A. WALKER delivered the judgment of the court.
Justice Oden Johnson and Justice Tailor concurred in the judgment.

**ORDER**

*Held*:   The evidence was sufficient to prove that defendant unlawfully possessed a firearm as the State's only witness was not impeached by omission.

¶ 1     Following a bench trial, defendant Michael Neal was found guilty of two counts of aggravated unlawful use of a weapon (AUUW) and one count of unlawful use of a weapon by a felon (UUWF). The trial court merged the counts into one count of AUUW and sentenced him to three years in prison. On appeal, defendant argues that the State failed to prove his AUUW

conviction beyond a reasonable doubt where the evidence was insufficient to show that he possessed a firearm. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant was charged by indictment with two counts of AUUW, which alleged that he carried on or about his person a firearm without a valid Firearm Owners Identification (FOID) card (720 ILCS 5/24-1.6(a)(1), (a)(3)(C) (West 2020)); the firearm was uncased, loaded, and immediately accessible, and he had no concealed carry license (CCL) (720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020)). He was also charged with one count of UUWF (720 ILCS 5/24-1.1 (West 2020)).

¶ 4      Chicago police officer Michael Nelson testified that around 10:17 p.m. on May 22, 2020, he and his partner, Officer Drinnan, were in uniform in an unmarked vehicle patrolling the 7200 block of South Paulina Street in a residential area of Chicago.[1] Nelson observed "numerous people" standing in the street and on the corner that evening, including defendant, who Nelson identified in court. It was dark outside, and defendant stood beneath a street light when Nelson first observed him from inside his vehicle. Nothing obstructed his view of defendant, who was about 25 feet away. Defendant wore a black hoodie and "tight fitting bluejeans." Nelson noticed a "suspicious bulge" in the right pocket area of defendant's pants. The bulge was "L-shaped," and Nelson recognized it as the outline of a firearm, which "as someone *** who carries a semiautomatic firearm, it matched the same shape."

¶ 5      Nelson stopped and exited his vehicle. He walked towards defendant, passing the "numerous people around." As Nelson approached, defendant turned around and walked away on

_____

[1] Officer Drinnan's first name is not included in the record on appeal.

Paulina. Nelson followed. Defendant ignored his commands to stop, and fled. Nelson pursued him on foot towards a vacant lot at 7214 South Paulina where he observed defendant "reach with his right hand and then throw a firearm to the left side of his body." He did not see where the firearm landed. Nelson did not see the firearm's color or size, but recognized it as a firearm based on his training and experience as he had "seen numerous semiautomatic firearms."

¶ 6     Defendant continued to flee until he reached 7212 South Paulina where he was stopped by Officer Davis.[2] Nelson detained defendant and searched him because he had "observed [defendant] with the firearm in his pocket, and *** there could have been another firearm as well." Nelson did not recover anything from the search. He then took defendant to Hermitage Avenue and transferred him to Drinnan's custody to wait for police transport. Nelson returned to where defendant initially fled on the 7200 block of Paulina and retraced the "flight path" to where defendant was detained to "[m]ake sure [defendant] didn't throw anything or drop anything that [Nelson] did not see him drop." Nelson did not find anything. When he returned to the location where defendant was detained, Nelson "instructed everybody where [he] observed the defendant throw the firearm" and the numerous officers present at the scene began searching the area.

¶ 7     Sergeant Ruhnke located the firearm in the yard of 7216 South Paulina, which was next door to where defendant was detained and in a lot covered in debris and overgrown grass and weeds.[3] Nelson recovered and inventoried the firearm, which "was leaned up against an object." Nelson described the firearm as being "warm," as if it was possibly "pressed up against [defendant's] body." Nelson was not aware of anyone else coming into contact with the firearm,

_____

[2] Officer Davis's first name is not included in the record on appeal.
[3] Sergeant Ruhnke's first name is not included in the record on appeal.

as the other officers were in the vacant lot at 7214 South Paulina, on the other side of a fence that separated 7214 and 7216 South Paulina.

¶ 8    On cross-examination, Nelson testified that he was driving and no one was between him and defendant when he first observed him. When Nelson stopped the vehicle, defendant was walking away and had walked past the other individuals on the street. When Nelson exited the vehicle, he walked past those same individuals. Nelson commanded defendant to stop, but defendant fled. Defendant's hoodie only went down to his waist, and Nelson was able to see what he believed to be a firearm in his right pocket. Nelson could not describe its color or what it "was made of," only that it was L-shaped. He believed it could only be a semiautomatic firearm based on its shape. He did not believe it could have been two phones with one horizontal and the other vertical, or two sticks tied together in an L-shape.

¶ 9    As defendant ran from Nelson, his back was to Nelson. Nelson saw a firearm in defendant's hand "as he was throwing it," but he did not see defendant remove it from his waistband or see it outside defendant's pocket while he followed defendant. Nelson observed defendant hold the firearm in his right hand and throw it to the left in front of his body. Nelson then clarified he "saw it after it left [defendant's] hand" and that he never saw the firearm in defendant's hand.

¶ 10    Nelson could not recall whether he mentioned seeing defendant throw a firearm in his arrest report. After refreshing his memory by reviewing the report, Nelson confirmed he did not mention the firearm in the narrative of his report. The report only stated that he saw defendant remove an object from his waistband with his right hand and toss the object to the left side of his body. Nelson acknowledged he could not, in fact, see defendant's right hand as he ran behind defendant. He saw "the motion of a person throwing a gun to the left side of his body." Nelson "observe[d] a gun,"

and had no reason for mentioning an "object" in the report rather than a gun. Nelson was behind defendant in the vacant lot, which had grass about waist-high, when defendant threw the firearm. Defendant was arrested about a half a block or less away. Defendant did not have anything on his person when he was arrested.

¶ 11    Nelson returned to where the chase began, rather than to where defendant had thrown the firearm, because he had "instructed the officers that were already standing in the area" where he "observed the firearm leave [defendant's] hand." He told the officers that "right around" the area of 7214 South Paulina, on one side of the fence, was where he saw the object being thrown. The officers did not find anything during their search of that area.

¶ 12    Nelson's sergeant told him there was a firearm leaning against a propane tank or some other object at 7216 South Paulina. It was about 15 feet and on the other side of the fence from where Nelson observed defendant throw a firearm, though Nelson never saw where the firearm landed. The recovered firearm was black and "L-shaped." Other than its L-shape, Nelson had no evidence that the recovered firearm was the object he saw in defendant's pants when he first pulled up or that defendant threw.

¶ 13    On redirect examination, Nelson testified that defendant did not have two phones or an L-shaped object when he was searched. Defendant did not have a FOID card or CCL. No one else was "around" where defendant threw the firearm. Nelson and defendant were alone, and there was no one nearby who could have thrown the firearm.

¶ 14    On recross-examination, Nelson testified that he did not know how long the firearm had been leaning against the propane tank or how it got there. He could not confirm that it was the same object he saw defendant throw. It took the officers about 17 minutes to find the firearm.

¶ 15    The court then questioned Nelson, who testified that, when he arrested defendant, defendant did not have the object that Nelson had seen in defendant's jeans. Nelson lost sight of defendant at one point during the pursuit when defendant crossed over Hermitage, one street to the west. Nelson explained that defendant "started off on Paulina, ran westbound through an empty lot, crossed over Hermitage through another empty lot," and was arrested on Hermitage.

¶ 16    On redirect examination, Nelson testified that he only lost sight of defendant for "[a] couple of seconds," and he regained sight of him within 20 feet. Nelson stated that defendant was wearing the same clothing when he regained sight of him.

¶ 17    The parties stipulated to the foundation of Nelson's body-worn camera footage from May 22, 2020, starting at approximately 10:17 p.m. The parties introduced 18 minutes of the footage, which this court has reviewed. [4]

¶ 18    In the video footage, we observe Nelson exit his vehicle. He approaches a group of about a dozen individuals, who are standing on the corner of a sidewalk under a streetlight, with their hands in the air. Across the street, on the other corner, there are more individuals with their hands in the air. There is no street light on this corner, but there is one across the street, at the edge of a grassy field. Nelson walks to this corner and past several individuals standing on the corner, shining his light, and asks, "y'all good?" Nelson shines his light on defendant, who is wearing a dark hoodie and light jeans and walking away from the corner down the dark sidewalk. As Nelson walks towards defendant, he calls out, "Hey, come here my man. Don't be walking away. Come here." Defendant turns right and runs down a dark gangway. Nelson pursues on foot and radios

---

[4] Though the entire 33 minute video is included in the record on appeal, the State only published footage from 1:55 to 19:59, which is the footage this court summarizes below.

that "he's running, he's running" on the 7200 block of Paulina, "westbound through the gangway." Nelson orders defendant to "just stop right there" but defendant continues to run. As Nelson is running, his body camera shakes. Yards, fences, and gangways are seen. Nelson exits a gangway, facing a street; another officer's flashlight is to his right. Defendant is not visible. Nelson says, "he's south," "one block west of Paulina." Nelson turns to his left, points his flashlight, and runs. Nelson stops, turns again, and says, "that way." Nelson runs towards a vacant lot with tall grass and weeds.

¶ 19    About 20 seconds later, a male voice is heard saying, "on the ground." Nelson then says, "don't f*** move." On the other side of a chain link fence, defendant is seen in a yard, lying face-down on the ground. An officer is standing over him, shining a flashlight on him. Nelson jumps over the fence, radios "in custody," and handcuffs defendant. Nelson pats defendant down. A male voice is heard, and Nelson responds, "Yeah, right where you're at, in there." Flashlights are seen. As Nelson walks through the yard and towards the street, he tells another officer, "It's in this yard, in here." An officer asks, "Over here?" Nelson responds, "yeah." More flashlights are seen.

¶ 20    Nelson walks through a gate and radios for a "cage car." Officers are seen searching the area in the background and a male voice is heard. Nelson responds, "I'll show you guys in a sec. I gotta see it." While Nelson is standing on the sidewalk, an officer approaches. Nelson asks the officer to stay with defendant and states that "a cage car is coming right now." Nelson hands defendant to the other officer. Nelson crosses the street and says, "yeah, through here." Nelson walks through a gangway and says, "Yeah it was right through here up over this fence" and then says, "through this gangway right here into that open lot."

¶ 21    Over the next 13 minutes, Nelson and other officers conduct a search with flashlights. Nelson returns to the vacant lot with the overgrown and tall vegetation. Nelson speaks to various officers during this search, pointing to where defendant "hopped over" a fence. He asks, "Sarge, can we all just kinda spread out and walk directly down?" Nelson continues his search of the vacant lot with a flashlight. An officer asks Nelson, "What part did you have eyes on him? Pretty much the same as I did?" Nelson responds, "Yeah, pretty much the same as you did," and that he lost defendant "in the shrubbery right there." Nelson refers to a "natural path" and states, "that's where he was coming down." An officer asks, "so right down the middle?" Nelson pointing his flashlight, responds, "yeah, I can't tell if he hopped right here or if he hopped right after the tree."

¶ 22    Nelson walks towards the street and an officer asks, "which gangway did he come through?" Nelson responds, "right here, this one right here." Nelson and the officer walk towards the gangway, and Nelson states, "He was still clenching his s*** though when he ran across the street." Nelson then says, "you got it? I knew it was f*** in there." He walks towards the overgrown, vacant lot. Nelson radios, "it's going to be 7214. On Hermitage. Sarge hang on, hang on, it's in the yard, it's gonna be 7216 then, 7216." Nelson walks through a gate, down a gangway, and jumps over a short chain link fence into the backyard. Officers on the other side of the chain link fence point flashlights in the backyard. Nelson says, "I see it" and shines his flashlight on a firearm on the ground leaning partially against a square object, next to a grill. Nelson recovers the firearm.

¶ 23    The parties stipulated that, if called, Gerald Daly of the Chicago police forensic division would testify that he examined the recovered firearm, magazine, and 14 live cartridges and did not

find fingerprints. The parties also stipulated that defendant had a prior qualifying felony conviction for UUWF, consisting of a 2013 conviction in Indiana for dealing narcotics.

¶ 24    The trial court found defendant guilty on all counts. The court stated that Nelson testified "in a clear and credible manner regarding what took place." The court explained that it strains credulity that so many officers and a sergeant "would spend 19 minutes looking for two wooden sticks or a couple of telephones." The court also stated, "importantly, *** this object *** wasn't in [defendant's] pocket when the police arrested him after his headlong flight, which begs the question of whatever it was that was in his pocket, why did he ditch it?"

¶ 25    Defendant filed a motion for a new trial and a supplemental motion, which the trial court denied. The court merged two counts into the AUUW count premised on defendant's possession of an uncased, loaded, and immediately accessible firearm without a CCL and sentenced him to the minimum term of three years in prison.

¶ 26                                    II. ANALYSIS

¶ 27    On appeal, defendant argues that the evidence was insufficient to prove him guilty beyond a reasonable doubt of AUUW because the only evidence the State offered linking him to possession of a firearm was Officer Nelson's testimony, which was impeached at trial and refuted by his body-worn camera video footage.

¶ 28    In considering a challenge to the sufficiency of the evidence, this court examines " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. McLaurin*, 2020 IL 124563, ¶ 22 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact is responsible for weighing the evidence and credibility of

witnesses and resolving any inconsistencies in the testimony. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (2009). It is not the reviewing court's function to retry the defendant. *People v. Gray*, 2017 IL 120958, ¶ 35. We will not substitute our judgment for that of the trier of fact on questions involving the weight of the evidence or credibility of the witnesses. *Id.* A conviction will be overturned only where "the evidence is so unreasonable, improbable or unsatisfactory" that there is reasonable doubt as to the defendant's guilt. *People v. Wright*, 2017 IL 119561, ¶ 70.

¶ 29    "The testimony of a single witness is sufficient to convict if the testimony is positive and credible." *Gray*, 2017 IL 120958, ¶ 36. If a defendant's conviction rests on eyewitness testimony, we must decide "whether a fact-finder could reasonably accept the testimony as true beyond a reasonable doubt." *Id.* The trier of fact's credibility determination is entitled to great deference, but is not conclusive on appeal. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). A witness's testimony may be found insufficient to convict "only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Id.* A conviction will not be reversed simply because the evidence is contradictory or because the defendant claims the witness was not credible. *People v. Bonaparte*, 2014 IL App (1st) 112209, ¶ 41.

¶ 30    To sustain a conviction for AUUW, as charged, the State was required to prove that defendant possessed a firearm, which was uncased, loaded, and immediately accessible, and that defendant lacked a valid CCL. 720 ILCS 5/24-1.6(a)(1), (a)(3)(A-5) (West 2020). Defendant solely challenges whether the State proved his possession of a firearm.

¶ 31    Viewing the evidence at trial in a light most favorable to the State, a rational trier of fact could find that defendant possessed a firearm and therefore is guilty of AUUW beyond a reasonable doubt. Nelson testified that he had an unobstructed view of defendant standing under a

streetlight when he first observed him. At that time, Nelson observed a "suspicious bulge" in the shape of an L in defendant's right pocket, which, based on his training and experience, he recognized as a firearm. Defendant walked away when Nelson exited his vehicle, and then fled when Nelson commanded him to stop. See *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 83 (defendant's flight from police indicates a consciousness of guilt).

¶ 32    Nelson pursued defendant on foot and observed defendant throw a firearm to his left side as they ran through a vacant lot overgrown with grass and weeds. Only Nelson and defendant were in the area and no one else could have thrown the firearm Nelson saw fly in the air. Defendant was detained moments later. No firearm or L-shaped object matching the suspicious bulge Nelson saw in defendant's pants was recovered from defendant during a protective pat-down. The trial court, as trier of fact, explicitly found that Nelson testified in a "clear and credible manner regarding what took place." We defer to that credibility determination. *Siguenza-Brito*, 235 Ill. 2d 213, 224-25 (the trier of fact is responsible for weighing the evidence and credibility of witnesses).

¶ 33    Nelson's testimony that he saw defendant throw a firearm, standing alone, is sufficient to prove defendant possessed a firearm as charged. *Gray*, 2017 IL 120958, ¶ 36 (the positive testimony of a single credible witness is sufficient to convict). Here, however, additional evidence supports that defendant possessed a firearm and attempted to hide it by throwing it away from him as he ran from police. Following a search by police officers in the area Nelson indicated he had seen defendant make the throw, and police recovered an L-shaped firearm. It was in a yard approximately 15 feet from where Nelson had observed defendant throw a firearm. It is a reasonable inference that the recovered firearm is the one Nelson saw defendant throw.

¶ 34 Further, Nelson's body-worn camera footage corroborates much of his testimony. The footage shows defendant walking away as Nelson approaches, defendant fleeing when Nelson commands him to stop, and Nelson pursuing him on foot. After the foot pursuit, defendant, wearing the same clothing as when he is first seen, is detained. Soon after, Nelson is heard directing a search. He instructs officers where to search and retraces defendant's flight path. Officers are seen searching the vacant lot, which was overgrown with tall vegetation making the search for the firearm challenging. The footage shows Nelson recovering the firearm, which was to the left and on the other side of the chain-link fence of the vacant lot that defendant and Nelson ran through moments earlier. The totality of the evidence, when viewed in a light most favorable to the State, was sufficient for a rational trier of fact to find that defendant possessed a firearm and was guilty of AUUW beyond a reasonable doubt.

¶ 35 Nevertheless, defendant claims that the evidence was insufficient to convict him because Nelson's testimony is refuted by his body camera footage. Specifically, although Nelson testified he observed an L-shaped bulge in defendant's pocket and defendant throw a firearm to his left during the foot pursuit, at no point in the body camera footage is Nelson heard informing his fellow officers of this information. Defendant claims it is improbable, unconvincing, and contrary to human experience that an officer who witnesses a suspect throw a firearm while fleeing would not mention this to other officers searching the area. In a similar vein, although Nelson testified he "[instructed] everybody where [he] observed the defendant throw the firearm" before the officers began to search the area, this instruction is not heard in the body camera footage. Defendant argues Nelson's failure to give an instruction or make a comment regarding a tossed firearm indicates the

omission of a critical fact at a time a person normally would have disclosed such a fact, which casts doubt on the believability of Nelson's testimony.

¶ 36    Under the rule for impeachment by omission, a witness's prior silence may be used to discredit his testimony where (1) he had an opportunity to make a statement, and (2), under the circumstances, a person would normally make that statement. *People v. Miller*, 2017 IL App (1st) 143779, ¶ 43; see *People v. Johnson*, 2021 IL App (1st) 171885, ¶ 80 (witness's inconsistent versions of events and omission of critical facts at a time when a person normally would have disclosed them cast doubt on the believability of his testimony).

¶ 37    We do not find Nelson's testimony impeached by omission. The fact that he is not heard in the body camera footage informing the other officers that he saw a firearm does not mean he did not tell them. Further, the entire sequence of events, from Nelson first observing defendant on the street with the L-shaped "suspicious bulge" in his jeans pocket until his arrest after the foot chase, occurred in under two minutes. The footage shows that, during the foot pursuit, Nelson kept other officers apprised of his location over the radio.

¶ 38    As this court has stated, "a trier of fact is not required to disregard inferences which flow normally from the evidence" and seek out all possible explanations consistent with a defendant's innocence and raise them to a level of reasonable doubt. *People v. Hall*, 194 Ill. 2d 305, 332 (2000). After defendant's arrest, Nelson directed a search and answered questions regarding the location of an object. Although Nelson is not heard stating that he observed defendant with a firearm, it is a reasonable inference from the officers' conduct and audible statements in the video footage that they were searching for a firearm at Nelson's behest. This necessarily entails that he at some point stated or confirmed that he saw defendant with a firearm. We will not disturb the trial court's

finding that defendant possessed a firearm, a factual issue, unless the evidence is so unbelievable, improbable, or palpably contrary to that finding that it creates a reasonable doubt of defendant's guilt. *People v. Carodine,* 374 Ill. App. 3d 16, 25 (2007). Our review of the body camera footage does not convince us that the Nelson's testimony was so unbelievable, improbable, or palpably contrary to the court's finding that defendant possessed a firearm that it creates a reasonable doubt of defendant's guilt. The record evidence does not compel the conclusion that no reasonable person could accept Nelson's testimony beyond a reasonable doubt.

¶ 39    Defendant also argues that the State did not present any other witnesses who saw him throw the firearm or forensic evidence tying him to the firearm. Again, "[t]he testimony of a single witness is sufficient to convict if the testimony is positive and credible" (*Gray*, 2017 IL 120958, ¶ 36), and physical evidence is not necessary to convict (*People v. Bobo*, 2020 IL App (1st) 182628, ¶ 43). We find the evidence demonstrating defendant's possession of a firearm was not so unreasonable, improbable or unsatisfactory that no reasonable person could accept it beyond a reasonable doubt.

¶ 40                                III. CONCLUSION

¶ 41    For the foregoing reasons we affirm the judgment of trial court.

¶ 42    Affirmed.