2025 IL App (1st) 231882-U

No. 1-23-1882

Order filed January 10, 2025

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 214001701 |
| | ) | |
| JESUS VARGAS, | ) | Honorable |
| | ) | Stanley L. Hill, |
| Defendant-Appellant. | ) | Judge presiding. |

_____

JUSTICE NAVARRO delivered the judgment of the court.
Presiding Justice Mikva and Justice Mitchell concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction for misdemeanor disorderly conduct over his contentions that his defense counsel was ineffective and he was denied due process because the trial court misunderstood a key fact from his trial testimony.

¶ 2    Following a bench trial, the trial court found defendant Jesus Vargas guilty of misdemeanor disorderly conduct and sentenced him to six months' supervision. Vargas now appeals his conviction and contends that: (1) his defense counsel was ineffective for presenting evidence about a pending lawsuit he had filed against multiple parties, including the complaining witness in this

case; and (2) he was denied due process because the court misunderstood a key fact from his trial testimony. For the reasons that follow, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      The State charged Vargas with one count of misdemeanor disorderly conduct for allegedly stopping his vehicle in front of Beniamino Mazzullo's house, playing loud music and screaming for approximately 30 minutes.[1] The case proceeded to a bench trial.

¶ 5                                  A. The State's Case

¶ 6      At trial, Mazzullo, the mayor of Stone Park, Illinois, for almost 22 years, testified that, in the evening of April 8, 2021, he was in his Stone Park residence watching television with his wife. His three children were also home at the time. Suddenly, Mazzullo heard screaming and loud music coming from outside, the intensity of which made his windows rattle. When Mazzullo left his house, he observed the music was coming from a red Chevrolet Malibu with its windows open parked on the street about 15 feet from his house. Mazzullo further observed that, inside the vehicle, was Vargas, who was screaming "[f]*** Mazzullo." As Mazzullo approached Vargas' vehicle, Vargas sped away. When Mazzullo returned to his residence, his family felt nervous due to Vargas' actions. About 10 minutes later, Vargas again appeared outside Mazzullo's house, playing loud music and screaming obscenities toward Mazzullo. This time, when Mazzullo went outside, he was able to record Vargas' license plate before Vargas sped away. Because Mazzullo felt threatened by Vargas, especially after seeing him a second time, Mazzullo called the police.

_____

[1] Although Mazzullo's last name is spelled "Mazzulla" elsewhere in the record, including in the misdemeanor complaint, at trial, the court reporter transcribed him spelling his last name "Mazzullo." We will use the spelling as transcribed by the court reporter.

¶ 7    Mazzullo recognized Vargas because the two had prior encounters, including one instance where Vargas antagonized public workers at a construction site for which Mazzullo was present. Another time, Mazzullo was at the Stone Park fire station helping residents fill out census forms when Vargas drove by screaming. Mazzullo believed that Vargas knew he was Stone Park's mayor because Vargas had previously sued the village and multiple Stone Park police officers. Although Mazzullo had not been named in that lawsuit, he was involved because the village had been sued. During cross-examination, defense counsel asked if the lawsuit had been settled to which Mazzullo responded affirmatively. Defense counsel then asked if there was a second lawsuit filed by Vargas in which Mazzullo was named personally as a defendant. Mazzullo responded affirmatively. Defense counsel presented for identification, and the trial court later admitted into evidence, defense's exhibit No. 1, which was a copy of a federal complaint filed by Vargas in 2022 naming Mazzullo and Stone Park police officers as defendants. Because the lawsuit remained pending, Mazzullo did not comment on its contents. Despite the various lawsuits, Mazzullo testified that he harbored no bias toward Vargas.

¶ 8    Sergeant Albi Numanaj of the Stone Park Police Department responded to Mazzullo's 911 call about Vargas. Sergeant Numanaj located Vargas, who was leaving a gas station in his red Chevrolet Malibu, and pulled him over. During their encounter, Vargas was uncooperative and actually called 911 himself. Sergeant Numanaj eventually arrested him for disorderly conduct. During Sergeant Numanaj's investigation, he took a statement from Mazzullo, but could not recall if Mazzullo told him that Vargas yelled obscenities. Although that fact was not in Sergeant Numanaj's report, he remarked that he does not put every fact in his police reports.

¶ 9                           B. The Defense's Case

¶ 10    In the defense's case, Vargas, a 25-year-old self-employed paralegal, testified that, on the night of April 8, 2021, he left a friend's house and apparently drove past Mazzullo's house, though he did not know Mazzullo lived in the area. According to Vargas, there was no encounter between the two the first time he passed Mazzullo's house. On Vargas' way home, he received a phone call from his friend saying that he had left his wallet behind. Vargas returned to his friend's house, retrieved the wallet and then proceeded on his way home again. While driving that night, Vargas listened to music loudly, but had no idea his music was causing a disturbance. As Vargas drove near Mazzullo's house, again unbeknownst to him, he observed Mazzullo come out of his house. Though Vargas had never seen Mazzullo in person, Vargas recognized him from social media.

¶ 11    Mazzullo came toward the corner of the street where Vargas was and yelled "what the f***" was Vargas doing there and told Vargas to "[g]et the f*** out of here." Later during direct examination, after confirming that he never left his vehicle during the second pass by Mazzullo's house, Vargas testified that there was never an exchange of words between him and Mazzullo. During cross-examination, Vargas asserted that Mazzullo yelled obscenities at him after his second pass by the house. The State then asked how Mazzullo could yell obscenities at him yet the two never exchanged words, as Vargas testified to on direct examination. Vargas responded: "So as you have been cross-examining, you also heard the mayor said he had multiple encounters, so I kind of got that confused, but my testimony is so the second time he approached my vehicle is what I was referring to, that he approached me." Although Mazzullo yelled obscenities at him, Vargas denied ever yelling obscenities back.

¶ 12    On direct examination, Vargas testified that, as Mazzullo yelled obscenities, he was fearful and "just drove past" Mazzullo. Later, during direct examination, in response to defense counsel's question about how long he was outside Mazzullo's house the second pass by, Vargas stated: "I

did stop to stare at him, because he was coming towards my vehicle. So I wasn't parked. I was literally passing by." On cross-examination, Vargas testified that he stopped his vehicle for about 10 seconds. Further, on cross-examination, the State clarified whether Vargas was fearful after the first pass by Mazzullo's house. Vargas reiterated that he was only scared on the second pass because he never saw Mazzullo the first pass by his house, which conformed with his testimony on direct examination. Nevertheless, following up on Vargas' answer, the ensuing colloquy occurred between the State and Vargas:

"Q. Which I believe is also a change from your initial testimony; isn't that right?

A. Can you explain how?

Q. Mr. Vargas, when your attorney was directing—performing his direct examination, you stated the first time when you passed by the house you were scared. Isn't that right?

A. If I did say that, I don't recall saying that, but I do recall saying that the first time I passed by, I did not see him. The second time that he approached my vehicle, in which this time I was spooked.

Q. I'm sorry. Mr. Vargas, you just stated now that the first time you passed by his house you didn't see him?

A. Correct.

Q. You didn't see him approach your car? That is now your testimony?

A. Correct.

Q. Mr. Vargas, when you were being direct examined, you stated that he spooked you the first time you passed by his house; isn't that right?

- 5 -

A. I don't recall.

Q. And now you're stating that you didn't see him at all the first time?

A. I'm saying that I did not see him at all the first time."

¶ 13 After driving away from Mazzullo's house, Vargas collected himself at a gas station. As he was leaving the gas station, Sergeant Numanaj pulled him over and arrested him. During direct examination, defense counsel asked Vargas asked if he had filed two lawsuits against various Stone Park individuals and entities, including the one displayed in defense's exhibit No. 1. Vargas responded affirmatively. Defense counsel also asked if the earlier lawsuit, which did not involve Mazzullo, had settled to which Vargas responded affirmatively.

¶ 14                    C. Closing Arguments, Verdict and Sentencing

¶ 15 During the State's closing argument, it argued that Vargas' actions of driving past Mazzullo's house not once, but twice, while playing loud music and yelling obscenities at Mazzullo demonstrated that Vargas committed the offense of disorderly conduct. In assailing the credibility of Vargas, the State posited that he "change[d] his testimony on cross-examination" and "[h]is story was not straight once." The State highlighted that, on direct examination, Vargas testified that he observed Mazzullo and became fearful yet stopped his vehicle to stare at Mazzullo. The State asked why, if Vargas was scared for his life, he would stop his vehicle and then why he would drive by Mazzullo's house a second time. The State further implied that, on direct examination, Vargas testified to seeing Mazzullo on his first pass by Mazzullo's house and noted that Vargas did not need to drive by Mazzullo's house a second time, "especially when he said was scared." The State then remarked: "But that story did not stay consistent. Upon cross-examination, [Vargas] said that he didn't see [Mazzullo] the first time; so therefore, he wasn't

scared of [Mazzullo] the first time when he drove by the house. It was, in fact, the second time that he was scared."

¶ 16    In response, defense counsel did not discuss the allegedly inconsistent testimony from Vargas, but rather posited that his actions were innocuous. According to defense counsel, all Vargas did was drive down a public street while playing loud music. Defense counsel highlighted that, in Sergeant Numanaj's report, there was no mention of Vargas yelling obscenities. Defense counsel further highlighted the lawsuits filed by Vargas, including the one naming Mazzullo, and argued there was "some bias" harbored by Mazzullo toward Vargas. Defense counsel concluded that, given the circumstances, the State failed to meet its burden to prove Vargas guilty.

¶ 17    Following the parties' closing arguments, the trial court discussed the two lawsuits filed by Vargas, first noting that the earlier one, which was from 2019, had settled. The court next observed that Vargas' second lawsuit, which had been admitted into evidence, was based on the events of the instant trial. Given the lawsuits, the court pondered: "Are we talking about bias on the part of [Mazzullo], or are we talking about opportunity on the part of [Vargas]? The court next focused on the competing testimony of Vargas and Mazzullo. It observed that, "as the state's attorney brought out," Vargas' "explanation regarding what happened on that night changed from" direct examination to cross-examination. The court, however, did not elaborate on what specific aspects of Vargas' testimony changed between direct examination and cross-examination. Conversely, the court found that Mazzullo "testified very credibly" about the incident, including harboring no bias toward Vargas that would cause Mazzullo to file a false police report against him. The court believed that Mazzullo's "concern" about Vargas was reasonable given the prior encounters between the two and Vargas returning to Mazzullo's house a second time. As to the lawsuit filed by Vargas against Mazzullo, the court asserted that it "impeache[d]" Vargas more than Mazzullo.

The court explained that the lawsuit coupled with Vargas' testimony "suggest[ed]" that he was attempting to obtain another settlement from Stone Park. The court ultimately found Vargas guilty of misdemeanor disorderly conduct.

¶ 18    The trial court subsequently sentenced Vargas to 6 months of supervision, ordered him to perform 50 hours of community service, prohibited him from having any contact with Mazzullo and fined him $750. This appeal follows.

¶ 19                                II. ANALYSIS

¶ 20                      A. Ineffective Assistance of Counsel

¶ 21    Vargas first contends that his defense counsel provided ineffective assistance by presenting evidence about the lawsuit he had filed against Mazzullo and Stone Park police officers. Vargas argues that, because the lawsuit had been filed after his encounter with Mazzullo, the lawsuit did not support the defense's theory that Mazzullo initiated the criminal case against Vargas due to personal animosity between the two.

¶ 22    The United States and Illinois Constitutions guarantee a defendant the right to the effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. When evaluating claims of ineffective assistance of counsel, the defendant must satisfy the two-part test established in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Gayden*, 2020 IL 123505, ¶ 27. Under the *Strickland* test, the defendant must establish that his counsel's performance was deficient and the deficiency prejudiced him. *Strickland*, 466 U.S. at 687. More specifically, the defendant must demonstrate that his counsel's performance fell below an objective standard of reasonableness, and there is a reasonable probability that, but for counsel's unreasonable performance, the result of the proceeding would have been different. *Gayden*, 2020 IL 123505, ¶ 27. To prevail on a claim

of ineffective assistance of counsel, the defendant must prove both prongs of the *Strickland* test. *Id.*

¶ 23 Decisions about what evidence to present relate to trial strategy. *People v. West*, 187 Ill. 2d 418, 432 (1999). As a general matter, decisions about trial strategy are immune from a claim of ineffective assistance of counsel. *Id.* "This general rule is predicated upon our recognition that the right to effective assistance of counsel refers to 'competent, not perfect representation.' " *Id.* (quoting *People v. Stewart*, 104 Ill. 2d 463, 492 (1984)). As such, "a mistake in trial strategy or an error in judgment by defense counsel will not alone render representation constitutionally defective." *People v. Peterson*, 2017 IL 120331, ¶ 80. "Only if counsel's trial strategy is so unsound that he entirely fails to conduct meaningful adversarial testing of the State's case will ineffective assistance of counsel be found." *People v. Perry*, 224 Ill. 2d 312, 355-56 (2007). We review whether the defendant received ineffective assistance of counsel *de novo. People v. Hale*, 2013 IL 113140, ¶ 15.

¶ 24 In the instant case, defense counsel made a reasonable decision to present evidence of the second lawsuit Vargas filed against Mazzullo and Stone Park police officers. As Vargas notes, this case boiled down to a credibility contest between him and Mazzullo, the long-standing mayor of Stone Park. From the trial's inception, defense counsel had a daunting task to impugn the credibility of Mazzullo, who carried with him an aura of inherent credibility given his public service role, and discredit his allegations against Vargas. This task became more difficult after the State introduced evidence that Mazzullo recognized Vargas from two prior encounters, where Vargas behaved churlishly, behavior not so dissimilar to Mazzullo's allegations. With this unenviable task and knowledge that Vargas had filed two lawsuits against various entities and individuals in Stone Park, including Mazzullo, defense counsel chose to present a theory that

Mazzullo harbored a bias against Vargas and reported him for disorderly conduct because of that bias. Under the circumstances, this was a reasonable defense theory, if not the only plausible theory, for counsel to pursue. See *People v. Cookson*, 215 Ill. 2d 194, 214 (2005) (observing "that a witness may be impeached by a showing of bias, interest, or motive to testify falsely").

¶ 25    Contrary to Vargas' argument, defense counsel did not present evidence of the second lawsuit to show that Mazzullo called 911 and initiated this criminal case against him in retaliation for Vargas himself suing Mazzullo. Rather, the evidence of the second lawsuit supported the defense theory that Vargas had been subject to harassment from individuals in Stone Park and this case was a continuance of that harassment. As previewed during opening statements, defense counsel remarked that this case was "motivated by a personal situation that has developed over the course of the years where Mr. Vargas feels that his rights were violated." During the State's direct examination of Mazzullo, it elicited that Vargas sued Stone Park and multiple members of its police department. During cross-examination of Mazzullo, defense counsel educed that, while Mazzullo had not been named personally in the lawsuit, he was still involved given Stone Park was a named defendant and the case had settled.

¶ 26    Such evidence connected defense counsel's opening statement about the animosity developed over the years between Vargas and individuals connected to Stone Park and provided support for the defense theory that Vargas had been harassed by individuals in Stone Park, including Mazzullo in this case. Testimony about the first lawsuit set the stage for defense counsel's introduction of evidence of the second lawsuit Vargas had filed against Stone Park police officers and Mazzullo. The second lawsuit was indisputably based on actions subject to the instant trial, and necessarily filed after the encounter between Mazzullo and Vargas on April 8, 2021. But the fact that Vargas filed the second lawsuit added potential legitimacy to his claim that he was

subject to harassment by Stone Park police officers and Mazzullo, and supported the defense theory that Mazzullo only reported Vargas for disorderly conduct based upon personal animosity. While, perhaps, defense counsel's presentation of this theory was not perfect and counsel could have more clearly connected the alleged bias of Mazzullo stemming from the original lawsuit, a defendant is only guaranteed "competent not perfect, representation." *People v. Easley*, 192 Ill. 2d 307, 344 (2000). Given the allegations against Vargas, defense counsel's introduction of evidence of the second lawsuit was a reasonable decision to attempt to show Mazzullo's bias against Vargas and impeach his credibility, and counsel presented that evidence competently. That ultimately, the trial court found Vargas guilty of disorderly conduct does not negate the reasonableness of defense counsel's decision, as such a decision must be viewed "from [counsel's] perspective at the time, rather than through the lens of hindsight." *Perry*, 224 Ill. 2d at 344.

¶ 27 Still, Vargas posits that, during closing arguments, his defense counsel demonstrated a fundamental misunderstanding of his second lawsuit. Vargas posits that defense counsel asserted Mazzullo initiated the criminal complaint against him in retaliation for Vargas naming Mazzullo personally in the second lawsuit, which, as previously discussed, would be counter to the timeline of events in the instant case. But Vargas misreads defense counsel's closing argument. Defense counsel stated:

> "Your Honor, we would ask that you would look at all of the these [*sic*] circumstances, particularly the fact that this Defendant has filed lawsuits against the Stone Park Police Department, and in one of them has named this particular complaining witness as a named party, and we would suggest to the Court that there is some bias there."

Defense counsel's comments do not show that counsel fundamentally misunderstood the nature of the second lawsuit. Rather, it shows that defense counsel painted a picture of ongoing harassment against Vargas from individuals in Stone Park, beginning with the first lawsuit and culminating with the events of April 8, 2021, that led to the instant trial and Vargas' second lawsuit that named Mazzullo personally.

¶ 28    In sum, as defense counsel's decision to present evidence of the second lawsuit was reasonable, counsel's performance did not fall below an objective standard of reasonableness, and he therefore did not provide ineffective assistance to Vargas. See *Gayden*, 2020 IL 123505, ¶ 27.

¶ 29                            B. Due Process Violation

¶ 30    Vargas next contends that he was denied due process because the trial court misunderstood a key fact from his testimony. Specifically, Vargas argues that, although he testified consistently on direct examination that he only observed Mazzullo once—on his second pass by Mazzullo's house at which point he became fearful—the court believed he testified on direct examination to seeing Mazzullo twice. And thus, according to Vargas, when he asserted on cross-examination that he only observed Mazzullo once, the court erroneously believed he had changed his testimony from direct examination.

¶ 31    Vargas concedes that he failed to object to the trial court's comment and raise the issue in a posttrial motion yet raises various avenues for this court to still consider his claim on appeal. Although Vargas asserts that he cannot forfeit this claim of error due to its nature, he argues that, if the claim can be forfeited, we should review it under the plain-error doctrine or, alternatively, his defense counsel was ineffective for failing to preserve the claim. Because, as will be explained below, the court did not misunderstand a key fact from his testimony, we need not endeavor into

a lengthy discussion of whether his claim can be forfeited and, if so, any alternative bases for us to consider the claim. See *People v. McNeal*, 2019 IL App (1st) 180015, ¶ 81.

¶ 32    Through their respective due process clauses, the United States and Illinois Constitutions guarantee a defendant the right to a fair trial. U.S. Const. amend. XIV; Ill. Const. 1970, art I, § 2; *People v. Blue*, 189 Ill. 2d 99, 138 (2000). The trial court's failure to accurately recall trial evidence may, depending on the circumstances, deny a defendant his right to a fair trial. *People v. Mitchell*, 152 Ill. 2d 274, 322-23 (1992); *People v. Williams*, 2017 IL App (1st) 150795, ¶ 39. When a defendant has "a bench trial, the trial court is presumed to have considered only competent evidence in reaching its verdict, unless that presumption is rebutted by affirmative evidence in the record." *People v. Simon*, 2011 IL App (1st) 091197, ¶ 91. We review whether the defendant's right to due process has been violated *de novo*. *People v. Totzke*, 2012 IL App (2d) 110823, ¶ 17.

¶ 33    During Vargas' direct examination, he testified that he only observed Mazzullo once, which was on his second pass by Mazzullo's house, and became fearful for his safety after observing Mazzullo on that second pass. Despite testifying consistently in this manner, on cross-examination, the State intimated through its questioning that Vargas actually testified on direct examination that he observed Mazzullo on the first pass by his house and was scared after that first pass. The State has considerable leeway when conducting cross-examination and attempting to impeach the testimony of a defendant. See *Doyle v. Ohio*, 426 U.S. 610, 617 n.7 (1976) (providing that, "unless prosecutors are allowed wide leeway in the scope of impeachment cross-examination some defendants would be able to frustrate the truth-seeking function of a trial by presenting tailored defenses insulated from effective challenge"). However, the State mischaracterized Vargas' testimony on direct examination as it related to him passing by Mazzullo's house and

when he observed Mazzullo. What's more, the State relied on that mischaracterization during its closing argument when trying to impugn Vargas' credibility.

¶ 34    While the State mischaracterized Vargas' testimony, an action which we have no basis to conclude was anything but innocuous based on the record, there is no affirmative evidence in the record that the trial court similarly misconstrued Vargas' testimony. In rendering its guilty verdict, the court asserted that Vargas changed his "explanation regarding what happened" from direct examination to cross-examination. But critically, in making this statement, the court did not elaborate on what specifically changed. The absence of elaboration is important because Vargas' testimony did, in fact, change from direct examination to cross-examination. During direct examination, Vargas testified that, as he observed Mazzullo come toward his vehicle on his second pass by Mazzullo's house, he "stop[ped] to stare at" Mazzullo, though never parking his vehicle, merely "passing by." However, on cross-examination, Vargas acknowledged stopping his vehicle for about 10 seconds, a different version than what he testified to on direct examination. Also on direct examination, Vargas testified that, on his second pass by Mazzullo's house, Mazzullo yelled obscenities at him yet also that there was never an exchange of words between the two. Then, on cross-examination, Vargas asserted that an exchange did occur on the second pass. In explaining the apparent discrepancy, Vargas remarked that he had been "confused" about which pass by Mazzullo's house he was discussing.

¶ 35    Given this testimony, the trial court correctly determined that there had been a change between Vargas' direct examination and cross-examination. While, certainly, one could view the aforementioned changes as minor, it is the trial court's responsibility, not the appellate court, to resolve conflicts in the evidence and determine the credibility of witnesses (*People v. Gray*, 2017 IL 120958, ¶ 35), even when testimonial inconsistencies are minor. See *People v. Bradford*, 187

- 14 -

Ill. App. 3d 903, 917 (1989) (stating that "the effect of minor testimonial discrepancies upon the credibility of the witnesses is a matter for the trial court's determination").

¶ 36    Vargas asks us to conclude that the trial court's comment about him changing his testimony from direct examination to cross-examination was specifically in reference to whether Vargas observed Mazzullo the first pass by his house or just on the second pass. An inference could be made that this was what the court was referencing given the amount of questions the State dedicated to this issue during its cross-examination of Vargas and the State's reference to this alleged inconsistency during its closing argument, the latter which was contemporaneous to the court's comment. But making such an inference would force us to speculate about the court's comment, which is contrary to the presumption afforded to the court that it relied only on competent evidence in reaching its verdict. See *People v. Brumley*, 229 Ill. App. 3d 16, 20 (1992) ("Defendant's speculation that the trial court relied on evidence outside the record, without more, is insufficient to overcome a presumption that the trial court considered only proper evidence in reaching its decision."). Because the court never elaborated on what changed from Vargas' direct examination to his cross-examination and his testimony did change in certain aspects, there is no affirmative evidence in the record showing that the court misconstrued or failed to accurately recall Vargas' testimony. Consequently, Vargas did not receive an unfair trial and was not denied due process as a result.

¶ 37                                    III. CONCLUSION

¶ 38    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 39    Affirmed.